LILLIE, J.
 

 The sole question involved in this litigation concerns the relative priority of the liens of a purchase-money trust deed held by respondents as sellers, and a deed of trust on the same land which was given to appellant as security for money advanced to the purchasers for construction purposes. Joined as defendants were the purchasers of the land and the contractor building on it (referred to hereinafter as the “Condon group’’),
 
 [1]
 
 the real estate brokers and various officers of corporate defendants. The action sought declaratory relief
 
 *89
 
 and an accounting, as well as damages based on fraud. Finding that there was no fraud, the trial court rendered judgment in favor of the individual defendants. It further found, however, that the disbursement of three classes of funds by-appellant under its loans, in excess of the principal amount of respondents’ deed of trust, was not within the subordination language contained in that instrument, it being additionally found that a second (and subsequent) subordination agreement (executed by respondents) was void for want of consideration. Judgment was given against nonappealing corporations in the Condon group and appellant for the principal amount of respondents’ deed of trust with interest at the rate therein provided up to the date of judgment.
 

 In 1957 respondents were the owners of a 40-acre parcel of undeveloped land in San Fernando Valley. Either in April or May of that year negotiations began for its sale to Charles J. Condon (the principal individual in the Condon group) and Condon Co., Inc. Condon, as will presently be noted, contemplated subdividing the land and selling lots therein to veterans on loans guaranteed by the Veterans Administration (popularly known as “61 Loans”). There was evidence, of representations to respondents that Condon and Condon Co. had adequate financial resources for the construction of offsite improvements (streets, sidewalks, sewers and utilities) and that a construction loan had been arranged through appellant to finance the building of residences; in order to obtain such loan, it was further represented, respondents would have to subordinate any purchase money trust deed to such construction loan. The escrow for the purchase was opened at the Van Nuys branch of Citizens National Bank on June 7, 1957. The escrow instructions set forth the subordination language of the trust deed, the conditions of such subordination being summarized as follows:
 

 1. Condon Co. was to borrow not to exceed 80 per cent of the value of the lots as shown by the Certificate of Reasonable Value issued by the Veterans Administration “in connection with a construction loan obtained for the purpose of constructing on each lot a dwelling house with usual appurtenances”;
 

 2. The interest on such loan was not to exceed 7 per cent per annum;
 

 3. Sellers’ (respondents’) deed of trust was subordinated to the lien of the construction loan obtained for the purpose above specified;
 

 
 *90
 
 4. The full face amount of the construction loan should be conclusively deemed to have been used for construction purposes ;
 

 5. Sellers (respondents) would reconvey each lot (162 in all) so as to release it from the lien of their trust deed upon payment to them of $2,000 per lot, each such $2,000 to be applied toward payment of the obligation secured by the trust deed.
 

 Following the signing of the above-described escrow instructions, the three Condon corporations (Folco, Chico and West-park) were organized for the purpose of taking title to the properties in question. On September 23, 1957, amended instructions were signed to show such companies as buyers; it appears that a further reason for the new instructions was the placing on the property of a $75,000 “partial construction loan” by the Condon companies. In such instructions, as amended, plaintiffs and all four Condon companies agreed that plaintiffs would receive as part of the purchase price a trust deed and note in the sum of $249,420.87 which would be second and junior to the partial construction loan just mentioned. The subordination language was expanded, however, to permit the proceeds of the final or permanent construction loan to be used for off-site improvements, namely, “in connection with a construction loan obtained for the purpose of constructing on each (lot) a dwelling house with usual appurtenances
 
 and lot improvements thereto.
 
 ...” (Emphasis added.)
 

 On the same day (September 23, 1957) Folco, Chico and Westpark signed and executed a deed of trust whereby the land was deeded to Citizens National Bank as trustee to secure the payment to respondents of the sum agreed upon; said deed of trust was recorded on September 25 (immediately following receipt of respondents’ deed to the property) and delivered to respondents on or about October 1. The subordination clause was as summarized earlier except for the language italicized in the preceding paragraph.
 

 Meantime, but prior to September 23, 1957, the four Condon corporations had received a commitment from appellant under which appellant had agreed to loan the monies necessary for improvements up to, but not exceeding, 80 per cent of the reasonable value as fixed by the Veterans Administration, with the improvements thereon. In this connection the trial court found that appellant had knowledge of the terms and provisions of respondents’ deed of trust, including the conditions
 
 *91
 
 governing the subordination of its lien to any construction loan made on the property. Under the terms of a separate agreement relating thereto, on or about October 18, 1957 (immediately following the recording by the purchasers of a tract map subdividing the property), the four Condon corporations obtained a loan from appellant in the total sum of $2,134,860. Contemporaneously therewith, the same four companies divided the property into three separate parcels—the first being conveyed to Chico Homes, the second to Poleo Homes and the third to Westpark Homes. As a result of this division, appellant’s construction loan took the form of three loans, evidenced by three notes and three deeds of trust, on the basis of $729,300 to Polco, $729,300 to Westpark and $676,260 to Chico.
 

 It is not disputed, and the trial court found, that appellant and the four Condon companies each knew that the $75,000 loan, characterized in the amended escrow instructions as “a partial construction loan,” was in fact being made for the purpose of applying its proceeds to the cash payment of the purchase price on respondents’ property and that said loan would be repaid
 
 [2]
 
 to appellant out of the proceeds of the construction loan which appellant had committed itself to mane. It is also undisputed that pursuant to the loan terms between the Condon group and appellant, the latter would receive in addition to 6 per cent interest a total of 13% per cent “points” (as they were popularly called) as a “fee” for the construction loan as well as the final loans to Gr. I. purchasers, of which 3% per cent was to be paid on making the construction loans and the balance on close of sales escrows to veteran purchasers.
 
 [3]
 
 The trial court found that respondents did not know of the loan arrangements just discussed, the disbursements of monies thereunder being two of the “three classes of funds” by appellant under its loans which, it was determined, were not within the subordination language contained in respondents’ trust deed. The “third” disbursement of monies (found not to have been within the subordination clause) involved an item of $158,607.36 paid to Condon Co. as
 
 *92
 
 a contractor’s fee for supervising the construction work for the three other Condon companies. We have previously referred to the trial court’s finding that the three purchasing companies were
 
 alter egos
 
 of Condon Co. All three disbursements, respondents point out, were made despite the fact that appellant “was never under any misapprehension as to what the construction loans might be properly applied for ’ ’; thus, each of the three purchasing corporations signed escrow agreements with appellant on the latter’s printed forms wherein it was set forth that the proceeds of the loan “will be used solely in the construction of said 51 houses, and not in any manner diverted for any other use”—each such agreement, of course, dealt only with the lots owned by each purchasing company.
 

 Continuing the chronology of events, the three deeds of trust securing appellant’s loans were recorded on October 25, 1957. The title company, at whose instance they were recorded, subsequently realized that there was an error. It seems that respondents’ deed of trust called for subordination to individual deeds of trust on each lot, whereas each Home Savings deed of trust was a blanket deed of trust on a specific one-third of the lots. The title company thereupon drafted a subordination agreement for execution by the Condon group and Dr. Collins. It was sent through appellant to the Condon group and Dr. Collins, all of whom signed the instrument. This second (or subsequent) subordination agreement was recorded by the title company at appellant’s request on October 31, 1957. Introductory matter omitted, it reads in pertinent part as follows:
 

 “And Whereas, it was the intent of the parties hereto, that said three deeds of trust, in favor of Home Savings and Loan Association, hereinbefore mentioned, constitute liens and charges on the lands respectively described therein, prior and superior to the lien and charge of the deed of trust first hereinbefore mentioned [respondents’ deed of trust].
 

 “Now, Therefore, in consideration of the premises and other valuable consideration, receipt of which is hereby acknowledged, it is hereby declared, understood and agreed that the lien and charge of the deed of trust in favor of the party of the second part [Dr. Collins], first hereinbefore mentioned be and the same is hereby made ■ subject and subordinate to the lien and charge of said three deeds of trust, in favor of Home Savings and Loan Association and each of them, as to the lands respectively described therein. ’ ’
 

 
 *93
 
 The project proved to be a failure—much evidence was received as to the reasons therefor. The construction loan became due on October 15, 1958; principal payments began to amortize on July 15,1958, at the rate of $21,348 per month. Respondents say that “the payments of this $2,134,860 loan depended directly upon houses being completed and ready for sale before July, 1958.”
 

 Various problems confronted the developers; their failure to cope therewith was due, the trial court found, to the fact that “they were inexperienced in handling construction projects of the size of the construction project involved herein” although “plaintiffs believed that said defendants were experienced in such matters.” The Condon group failed to make the monthly amortization payments (due July 15, 1958), and in December of that year Condon said he would no longer even pay the interest. On December 23, 1958, apparently for the first time, Dr. Collins met with appellant’s president (and general manager), at which respondents assertedly first learned of the 13% per cent fees claimed by appellant. Nothing came of this meeting, and on January 14, 1959, the instant litigation was commenced. Appellant thereafter commenced foreclosure proceedings—on January 20, 1959. Because the houses had been sold to individual purchasers after the foreclosure, the trial court awarded damages to respondents rather than relief against the property: “That because defendant Home Savings has conveyed the properties to various and sundry persons who have purchased the 161 lots following the trust deed sales hereinabove described, and because the maximum damages which plaintiffs would be entitled to recover are $249,420.87, representing the unpaid principal of their trust deed, together with interest thereon at the rate of 6% per annum from January 1, 1958, it is more equitable to grant a recovery to plaintiffs in damages for such amount, instead of setting aside the trust deed sales and involving the said lot purchasers.”
 

 Although the trial consumed some 18 days (the reporter’s transcript exceeds 2,500 pages) and more than 170 exhibits were received, both sides now tell us that this protracted litigation can be resolved by the application of simple rules of contract law relating to qualified subordination agreements; more particularly, all of the limitations in the original subordination agreement were either destroyed by the second (or subsequent) agreement executed approximately one month later, or such limitations were left fully effective. The trial
 
 *94
 
 court found that the latter alternative was the fact, its reasons therefor being set forth in Finding of Fact XVII: “That following the execution and delivery of the three notes and three deeds of trust to defendant Home Savings, evidencing its construction loan totalling the sum of $2,134,860.00, and following the recordation of the last three mentioned deeds of trust on October 25, 1957, and on or about the 31st day of October, 1957, defendants Folco Homes, Inc.; Chico Homes, Inc. and Westpark Homes, Inc., and plaintiff Robert F. Collins, signed an instrument in writing designated as ‘ Subordinate Agreement. ’ That under and pursuant to the termo of said Subordination Agreement, the said parties purported to agree that the deed of trust securing the $249,420.87 indebtedness to plaintiff was subordinated to the three deeds of trust securing the construction loan, as hereinabove described.
 

 “That there was no provision in such Subordination Agreement which specified or required that any proceeds of the loan secured by said last mentioned three deeds of trust should be used for any purpose. That said Subordination Agreement had been prepared by Title Insurance and Trust Company and presented to Home Savings, which defendant in turn presented the same to defendants Folco Homes, Inc., Chico Homes, Inc. and Westpark Homes, Inc. for signing and that said last named three defendant corporations caused such document to be presented to plaintiff Robert F. Collins for his signature.
 

 “That neither the defendant Home Savings nor any of the four defendant corporations herein knew the reason or purpose for having such Subordination Agreement executed, other than that Title Insurance and Trust Company had requested the same, and that Title Insurance and Trust Company, in requesting that the same be signed by the said parties, did not intend in any way to change the terms and provisions of the subordination language contained in the trust deed which plaintiffs had received as security for the unpaid portion of the purchase price due them, and did not intend to thereby release or absolve any of the defendants from their obligation to see that the proceeds of the construction loan from defendant Home Savings were used to pay for services and materials furnished in connection with the improvement of the property involved in this action.”
 

 Appropriate conclusions of law were drawn from the foregoing findings.
 

 The court also found that “ [1] there was no consideration for the signing or execution of such Subordination Agreement
 
 *95
 
 in that the rights, duties and liabilities of plaintiffs, and of all of the defendants herein, had already been fixed and established prior to the signing, execution and recording of such Subordination Agreement, and in that [2] plaintiffs received no benefit whatsoever from the same, and [3] none of the defendants gave up any rights, properties or other consideration to obtain the signature of plaintiff Robert F. Collins thereon. That [4] at the time plaintiff Robert F. Collins signed such Subordination Agreement, he did not know, and was not advised by anyone, of the purpose for which such Subordination Agreement was being executed. ’ ’
 

 Although the four bases of the court’s ruling, listed in the paragraph just quoted, are challenged by appellant as being either wrong as a matter of law or failing to support the ultimate conclusion reached, from an overall standpoint the validity of the respective claims on this appeal must, as mentioned above, be determined by the governing rules relating to qualified subordination agreements in the light of the particular facts attending the transaction.
 

 Different liens upon the same property have priority according to the time of their creation (Civ. Code, § 2897) ; a party, however, may agree to waive or subordinate the priority thus accomplished.
 
 (International Mortgage Bank
 
 v.
 
 Eaton,
 
 39 Cal.App. 39 [177 P. 880]; 59 C.J.S., Mortgages, §218.) An agreement to subordinate a mortgage (or trust deed) may be made subject to particular terms or conditions, the validity of such conditional subordination agreements being recognized in California.
 
 (Bank of America
 
 v.
 
 Hirsch Mercantile Co.,
 
 64 Cal.App.2d 175, 183 [148 P.2d 110].) In the present case respondents expressly conditioned the original subordination of their purchase money trust deed upon the fulfillment of certain limitations therein set forth and hereinbefore listed. Among other things, the developers were permitted to obtain a construction loan upon the security of the lots severally and each such loan was to be evidenced by a promissory note bearing interest not in excess of 7 per cent and in an amount not to exceed 80 per cent of the lot’s reasonable value. The gist of appellant’s argument (among others) is to the effect that the second (or subsequent) subordination agreement effectively discharged each and all of these limitations; the language in that agreement, says appellant (citing
 
 Estate of Gaines,
 
 15 Cal.2d 255 [100 P.2d 1055]), is clear and unambiguous and not subject to contradiction by parol testimony. The instrument declares that “it
 
 *96
 
 was the intent of the parties . . . that said three deeds of trust in favor of Home Savings and Loan Association . . . constitute liens . . . prior and superior to the lien and charge of the deed of trust hereinbefore mentioned [respondents’ deed of trust] ” and accordingly “it is hereby declared, understood and agreed that the lien and charge of the deed of trust in favor of the party of the second part [Dr. Collins] ... be and the same is hereby made subject and subordinate to the lien and charge of said three deeds of trust [in favor of appellant] ... as to the lands respectively described therein.” But the question the trial court felt called upon to decide was whether respondents were thereby subordinating the lien of their trust deed as expressly conditioned by the terms and conditions relating to the construction loan agreements under which appellant’s loans were to be made; it did so notwithstanding the admonition that the courts should proceed cautiously in supplying a provision by implication which the parties have omitted from their written contract
 
 (Foley
 
 v.
 
 Euless,
 
 214 Cal. 506, 512 [6 P.2d 956]) since “Words should not be added where the omission may have been intentional.”
 
 (United States Bldg. & Loan Assn.
 
 v.
 
 Salisbury,
 
 217 Cal. 35, 40 [17 P.2d 140].)
 

 The trial court’s action in permitting the introduction of extrinsic evidence by parol may not be validly challenged.
 

 In the first place, it appears that such evidence went in without objection and it is settled that the admission of parol evidence to vary or add to a written instrument cannot be objected to for the first time on appeal.
 
 (Pao Ch’en Lee
 
 v.
 
 Gregoriou,
 
 50 Cal.2d 502, 506 [326 P.2d 135].)
 

 Secondly, it is likewise the law that when language used in a written contract is fairly susceptible to one of two constructions, extrinsic evidence may be considered to aid the court in ascertaining the true intent of the parties—not to show that parties meant something other than what was said but to show what they mean by what they said.
 
 (Television Arts Productions, Inc.
 
 v.
 
 Jerry Fairbanks, Inc.,
 
 164 Cal.App.2d 842, 849 [331 P.2d 117].) True, the question whether an agreement is, or is not, ambiguous is always one of law; but, as pointed out in the case last cited (which quotes from a recognized work on the subject) :
 
 “Ambiguity in a written contract, calling for construction, may arise as well from words plain in themselves but uncertain when applied to the subject matter of the contract, as from words which are uncertain in their literal sense
 
 and it may be discovered on
 
 *97
 
 cross-examination, without precluding its explanation,
 
 but it must relate to a subject treated of in the paper and must arise out of words used in treating that subject . .
 
 .” (p. 845). There are various other guides which doubtless governed the trial court’s action in the premises. Thus, “In the interpretation of contracts the duty of the court is to ascertain the intent of the parties. ... To assist it in the performance of this duty the court may look to the circumstances surrounding the parties at the time they contracted [citations], including the object, nature and the subject matter of the agreement [citations], and the preliminary negotiations between the parties [citation], and thus place itself in the same situation in which the parties found themselves at the time of contracting [citations].”
 
 (Lemm
 
 v.
 
 Stillwater Land & Cattle Co.,
 
 217 Cal. 474, 480-481 [19 P.2d 785].)
 

 As already mentioned, one circumstance leading up to “the situation in which the parties found themselves at the time of contracting” was the assertedly erroneous wording of the three trust deeds to be given appellant by the Condon group. At an early session of the trial, one Stover, a title officer of the Title Insurance and Trust Company, was called (out of order) by appellant. He stated that the only reason for seeking the second subordination agreement was his company’s wish to be certain that respondents’ trust deed would be subordinated to the trust deeds which the developers were executing. His testimony in this regard is as follows: ‘ ‘ The original subordination clauses provided for a deed of trust on each lot, and the trust deeds were recorded in a blanket trust deed for every 10 or 15 lots; because of the language, we had to ask for a new Subordinate [sic] Agreement to provide for the multiple or blanket trust deed recordings. The language
 
 is—it did not change the terms of the
 
 subordination.” (Emphasis added.) Again, in its original answer to certain written interrogatories relative thereto, appellant admitted that it did not know that the subsequent subordination agreement altered any of the restrictive language in respondents’ trust deed. Such doubts on the part of persons interested as to the meaning of the critical clause used in framing the agreement serve to demonstrate in themselves that the instrument was ambiguous.
 
 (California Emp. Stab. Com.
 
 v.
 
 Walters,
 
 64 Cal.App.2d 554 [149 P.2d 17].) Otherwise stated, “the parties by their actions have created the ‘ambiguity’ . . . .”
 
 (Crestview Cemetery Assn.
 
 v.
 
 Dieden,
 
 54 Cal.2d 744, 754 [8 Cal.Rptr. 427, 356 P.2d 171].)
 

 
 *98
 
 Although respondents’ claim in that regard is vigorously disputed, the trial court found that appellant had actual, as well as constructive, knowledge of the subordination language in their purchase money trust deed; the choice of conflicting inferences is for the trier of fact, and the evidence supports the challenged finding in that regard. This aspect of the case is important because it is the general rule that “Where two or more written instruments are executed contemporaneously, with reference to each other, for the purpose of attaining a preconceived object, they must all be construed together, and effect given if possible to the purpose intended to be accomplished.”
 
 (Burnett
 
 v.
 
 Piercy,
 
 149 Cal. 178, 189 [86 P. 603].) This principle controls whether each of the several instruments was signed by all or only some of the parties to the transaction.
 
 (Mayers
 
 v.
 
 Loew’s Inc.,
 
 35 Cal.2d 822 [221 P.2d 26].)—Thus, the transaction may be tripartite or even more complex, a factor that must not be disregarded in the process of interpretation of any of the documents. (3 Corbin on Contracts (1960) § 549, pp. 102-103.) With these principles in mind, it appears that Stover also testified that his company’s policy was to be on a “construction loan”; an officer in the Condon group stated that appellant had given him the document (the second subordination agreement) for delivery to and execution by, Dr. Collins who, upon being handed the instrument for signature, was told that “it was something that T.I. wanted.”
 

 The trial court, therefore, placing itself in the situation confronting the parties, could properly infer that it would be rather incredible for respondents (through Dr. Collins) to have subordinated the lien of their purchase money deed of trust to those of other tremendously larger liens (particularly the three disbursements singled out in the findings) which would have made respondents’ trust deed of questionable worth. (Dr. Collins, it appears, was not without experience in real estate transactions; too, Mrs. Collins had obtained a broker’s license so she could help her husband in his several real estate investments.) On the contrary, the trial court could, and presumably did, infer that the only reason for respondents’ subordination of their lien was the expectation that if payments were advanced by appellant solely for construction purposes, the liens superior to their own would increase in value only as the property under development enjoyed a corresponding increase in value because of the accompanying progress in the work of construction. As for
 
 *99
 
 appellant, it has been (and still is) insisted that the project was feasible from its inception, even though the trial court concluded that appellant was possessed of facts which made the contrary result foreseeable—those facts, of course, appellant seemingly chose to disregard. Since, as noted above, the restrictive terms of respondents’ original subordination were known to all concerned, it is a reasonable deduction that appellant resolved to proceed with the enterprise notwithstanding such conditional subordination and under the belief that the undertaking, with the handsome profits realizable therefrom, would prosper. That such was the construction, at least from a practical standpoint, placed by appellant upon the entire series of transactions is discernible from its action in advancing a substantial portion of the loan proceeds—some $252,610, to be exact—before the second subordination agreement (the one here in suit) was ever executed. Appellant argues that these disbursements were made under a mistaken belief as to priority; opposed to this contention, however, is the testimony of the title company’s officer, introduced by the appellant itself, that the basic provisions of the original subordination agreement were not changed or altered by the language of the latter instrument.
 

 It is a familiar rule that “when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court.”
 
 (Universal Sales Corp.
 
 v.
 
 California etc. Mfg. Co.,
 
 20 Cal.2d 751, 761 [128 P.2d 665].) The rule is thus rationalized in the cited case (p. 761) : “The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention [citations]. As was said in
 
 Mitau
 
 v.
 
 Roddan,
 
 149 Cal. 1, 14 [84 P. 145, 6 L.R.A. N.S. 275]: ‘It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the intention of their
 
 *100
 
 contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them seeks a construction at variance with the practical construction they have placed upon it . . . .’ ”
 

 These rules being applied to the instant case, the meaning of the practice becomes fairly evident. When substantial advances were made by appellant prior to the agreement in suit, it demonstrated by such actions that it was convinced of the financial feasibility of the project—as mentioned above, it still adheres to that view with the single qualification that “it took too long” to complete. Not until delays were encountered and the failure of the project became imminent did appellant seek to be released from an apparently bad bargain by the assertion of claims which are the subject of this litigation. Since the net effect of these claims is that a new obligation was substituted for an existing one, we are asked to declare that a novation was effected (Civ. Code, § 1530). But the question whether a novation has taken place is always one of intention
 
 (Producers’ Fruit Co.
 
 v.
 
 Goddard,
 
 75 Cal.App. 737, 755 [243 P. 686]); and therefore it is “one of fact and depends upon all the facts and circumstances of the particular case.”
 
 (Manfre
 
 v.
 
 Sharp,
 
 210 Cal. 479, 481 [292 P. 465].) To the same effect is
 
 Alexander
 
 v.
 
 Angel,
 
 37 Cal.2d 856, 860 [236 P.2d 561], which also declares that “the weight and sufficiency of the proof [are] matters for the determination of the trier of the facts under the general rules applicable to civil actions.” In this regard, the practical construction placed on the contract by the parties is more convincing than a construction which has been reached in an attempt to escape liability in the circumstances. Nor are we impressed by appellant’s argument, which is persisted in, that its instructions called for a title policy showing its trust deeds to be first liens on the real property involved; such security, appellant says, it was required by law to have (Fin. Code, § 7102). It is enough to refer again to the testimony of the title officer as to
 
 his
 
 understanding of the terms of the subordination at bar. If the title company was remiss in its duties, respondents should not be penalized therefor; after all they had nothing to do with that particular transaction.
 

 We find substantial evidence in the record to support the trial court’s finding which interprets the agreement in suit; contrary to appellant’s suggestions, we need do no more.
 

 
 *101
 
 “ It is well-settled that an appellate court will accept the interpretation of a contract adopted by the trial court and will not substitute another of its own where parol evidence has been introduced in aid of its interpretation and such evidence will support conflicting inferences.
 
 (Estate of Rule,
 
 25 Cal.2d 1,11 [152 P.2d 1003,155 A.L.R. 1319];
 
 Johnston
 
 v.
 
 Landucci,
 
 21 Cal.2d 63, 69 [130 P.2d 405, 148 A.L.R. 1355];
 
 Universal Sales Corp.
 
 v.
 
 California etc. Mfg. Co.,
 
 20 Cal.2d 751, 772 [128 P.2d 665];
 
 Overton
 
 v.
 
 Vita-Food Corp.,
 
 94 Cal.App.2d 367, 370 [210 P.2d 757].) ‘Where extrinsic evidence has been properly admitted as an aid to interpretation, and either the evidence or inferences therefrom are in conflict, any reasonable construction by the lower court will be upheld under the general rule of conflicting evidence. ’ (3 Within, California Procedure, 2253, § 89.) ”
 
 (Brookes
 
 v.
 
 Adolph’s Ltd.,
 
 170 Cal.App.2d 740, 746 [339 P.2d 879].)
 

 In view of the above determination, we do not reach the point, rather extensively argued pro and eon, that there was no consideration for the signing of the second subordination agreement. The trial court was not in error, however, in receiving extrinsic evidence in this regard, for it is established that the true consideration of a contract may thus be shown.
 
 (Shiver
 
 v.
 
 Liberty Bldg.-Loan Assn.,
 
 16 Cal.2d 296, 299 [106 P.2d 4].)
 

 The only other point requiring attention is the contention that respondents are equitably estopped to assert their present claims. Of the two innocent parties, it is said that respondents being careless should bear the loss (Civ. Code, § 3543). It seems to us that there was a measure of carelessness on the part of both parties to this appeal. Each apparently relied upon the judgment of the title company, and accordingly the maxim stated in section 3543 has no application. (B
 
 anco Mercantil
 
 v.
 
 Sauls Inc.,
 
 140 Cal.App.2d 316, 325 [295 P.2d 55].) Too, the existence of estoppel is a question of fact for the determination of the trial court.
 
 (Parke
 
 v.
 
 Franciscus,
 
 194 Cal. 284, 297 [228 P. 435].)
 

 For the foregoing reasons, the judgment is affirmed.
 

 Wood, P. J., and Fourt, J., concurred.
 

 A petition for a rehearing was denied July 23, 1962, and appellant’s petition for a hearing by the Supreme Court was denied August 22, 1962.
 

 [1]
 

 The Condon group consisted of three corporate purchasers of respondents’ land (Foleo Homes, Inc., Chico Homes, Inc., and Westparlc Homes, Inc.) and the Condon construction company (Charles J. Condon Co., Inc.). The trial court found that Foleo, Chico and Westpark were
 
 alter egos
 
 of the construction company.
 

 [2]
 

 The $75,000 promissory note was secured by a trust deed which bore interest at 7% per annum, plus a loan fee of 1%, or $750, charged by appellant for making such loan. Pursuant thereto, the sum of $76,420 was repaid to appellant.
 

 [3]
 

 $86,940 of the loan proceeds were immediately applied by appellant to pay itself a portion of the total points it was charging. Of this sum, Poleo and Westpark each contributed $29,700, and Chico the remaining $27,540.