**In re GVF CANNERY, INC., d/b/a Garden Valley Foods, a California corporation, Debtor.**

**Ed SILVA, d/b/a Ed Silva Farms, Plaintiff–Appellee,**

**v.**

**WELLS FARGO BANK, N.A., Defendant–Appellant.**

**Civil No. 96–20149 SW.**

United States District Court, N.D. California.

Sept. 11, 1996.

Order Denying Rehearing Oct. 1, 1996.

Paul R. Bessette, Brobeck Phleger & Harrison, San Francisco, CA, for Defendant–Appellant.

William J. Bush, Hanson Bridgett Marcus Vlahos & Rudy, San Francisco, CA, for Plaintiff–Appellee.

### ORDER AFFIRMING IN PART, REVERSING IN PART AND REMANDING CASE

SPENCER WILLIAMS, District Judge.

Appellant Wells Fargo Bank, N.A. ("Wells Fargo") brings this appeal from the bankruptcy court's decision in an adversary proceeding initiated by Appellee Ed Silva relating to the bankruptcy of GVF Cannery, Inc. ("GVF"). Based on the following, the bankruptcy court's decision is AFFIRMED IN PART, REVERSED IN PART and REMANDED for further proceedings consistent with this Court's decision.

## BACKGROUND

GVF is a tomato cannery located in Gilroy, California. Wells Fargo began loaning money to GVF in 1982. Each year, Wells Fargo would provide the working capital necessary for GVF to complete its annual pack of processed tomato products, sell its inventory and collect receivables. As collateral, GVF gave Wells Fargo a first priority security interest in all of GVF's accounts, inventory, equipment and fixtures.

To ensure Wells Fargo's first priority as a creditor, GVF had a policy of asking all growers to sign subordination agreements at the time they executed tomato sales contracts. These agreements subordinated the growers' first priority under their producer's liens, Cal. Food & Agr.Code § 55631 *et seq.*, to Wells Fargo's rights.

Silva began farming in Monterey County in 1964. By 1989, he owned a 13,000 acre farm where he grew vegetables such as broccoli, cauliflower, tomatoes and peppers. That year his gross sales were approximately $25 million.

Although Silva is illiterate, he conducts much of his business himself on a handshake basis. When necessary, he can also decipher numbers to confirm essential terms in written contracts such as prices and dates.

In January of 1989, GVF's chairman of the board, Fred Avalli, and another GVF employee, Tim Brooks, contacted Silva to see if he would agree to sell GVF 7,000 tons of tomatoes. Avalli was an old friend of Silva's from high school. After meeting with Avalli and Brooks, Silva agreed to supply the tomatoes. Avalli and Brooks produced a contract and explained to Silva that it was for 7,000 tons of tomatoes at $53 per ton. Silva signed this contract.

Thereafter, Brooks asked Silva to sign a subordination agreement as well. Brooks explained the agreement by saying "we present the contract and the subordination clause together and what that means is that you sign that and that's how you get paid for your tomatoes. The bank gives us the money and we give it to you." Silva then signed the subordination agreement.

Silva planted the tomatoes in April of 1989, harvested and delivered them in November, and received full payment.

In late 1989, Avalli and Brooks contacted Silva again and asked him to grow 30,000 tons of tomatoes for the following year. They represented that GVF was doing well and that they needed to double their capacity because the market for tomatoes was so strong. They met with Silva at an El Charro restaurant and arranged a tentative deal.

On December 11, 1989, Brooks visited Silva in the fields, bringing with him a contract for the 1990 crop year. Brooks told Silva that the contract was for 30,000 tons of tomatoes at $54 per ton. Brooks also presented Silva with another subordination agreement and explained that it "gives us the money to pay you the only way we could pay from the Bank is sign this and then the bank pays us and we pay you." Silva asked about the bank and how GVF's business was doing. Brooks assured Silva that both were fine. Silva signed both documents.

Then, in April 1990, Avalli and Brooks contacted Silva again and said they wanted to meet him at the El Charro restaurant. At breakfast, they assured him that everything was going great with the bank and with their business. They then asked Silva to sign another subordination clause.[1] Silva replied that a subordination clause is "no good," and told Avalli and Brooks about his experience with Watsonville Canning when it went bankrupt and Silva ended up only getting 25 percent of his money. Avalli replied that the subordination clause would do Silva no harm. He said, "it guarantees you you're going to get your money. The bank has guaranteed the money's going to be there for the tomato crop." Avalli added that Silva would be paid within 10 days, and that he only needed to trust him for that long. Based on these assurances, Silva signed the subordination agreement.

---

1. This second subordination clause was apparently necessary because the previous one was printed with the wrong year.

In fact, GVF was not doing very well financially. During 1987, due to GVF's loss of over $4 million during the prior fiscal year, Wells Fargo transferred GVF's account to its Loan Adjustment Group. Wells Fargo also advised GVF to seek alternate financing for its operations, in part because the bank considered GVF to be a poor credit risk. At the time GVF first asked Silva to grow tomatoes, GVF had a negative net worth of almost $6 million. GVF's financial condition only worsened over the following year until its bankruptcy.

Silva began to harvest approximately 25,000 tons of tomatoes in September of 1990. He received his first payment from GVF within ten days, but thereafter the payments began to lag. When Silva called Avalli to inquire about his money, Avalli told him that GVF was having financial difficulties. Silva received occasional payments until March 7, 1991, but none after that. GVF ended up owing Silva approximately $1.1 million.

On November 12, 1990, GVF filed for Chapter 11 bankruptcy. On May 15, 1992, the case was converted to Chapter 7 and GVF's assets were liquidated. The amount remaining after liquidation was not enough to cover GVF's liability to Wells Fargo. Consequently, if Silva's priority were subordinated to Wells Fargo's, Silva would receive nothing.

Silva initiated an adversary proceeding on January 21, 1992, alleging that the waiver of his producer's lien was invalid and that GVF obtained subordination of his priority through fraud. As a result, Silva claimed that he rightfully had priority over Wells Fargo.

After conducting a five day trial, United States Bankruptcy Judge Arthur Weissbrodt agreed with Silva. In an order dated September 29, 1995, the bankruptcy judge found that the subordination agreement signed by Silva was a waiver of a statutory right which was ineffective due to Silva's lack of information about the rights he was waiving. *In re GVF Cannery, Inc.,* 188 B.R. 651, 671 (N.D.Cal.1995). Furthermore, the judge stated that even if the subordination clause were not a waiver, but instead was an enforceable contract, it was subject to rescission because Silva was induced to enter into it based on GVF's fraudulent representations. *Id.* Consequently, the bankruptcy court refused to subordinate Silva's claim to Wells Fargo's.

## LEGAL STANDARD

Pursuant to Rule 8013 of the Federal Rules of Bankruptcy, the district court may affirm, modify or reverse the bankruptcy court's decision, or remand for further proceedings. The factual determinations of the bankruptcy court are subject to the "clearly erroneous" standard, while the bankruptcy court's conclusions of law are subject to *de novo* review. *In re Comer,* 723 F.2d 737 (9th Cir.1984); *In re Capital West Investors,* 186 B.R. 497, 499 (N.D.Cal.1995).

## ANALYSIS

Wells Fargo asserts that the bankruptcy court's decision was erroneous in three respects: (1) the subordination agreement should have been analyzed as an enforceable contract, not as a waiver of a statutory right; (2) even if the subordination agreement were properly subject to waiver analysis, the bankruptcy court misapplied California's waiver doctrine; and (3) as an enforceable contract, the subordination agreement was not subject to rescission for fraud because Wells Fargo was a third party beneficiary who relied upon the subordination agreement.

I. *The Bankruptcy Court Was Correct in Applying Waiver Analysis to the Lien Subordination Agreement*

The bankruptcy court decided that Silva's subordination of his producer's lien under Cal.Food & Ag.Code § 55633 was subject to analysis as a waiver. On appeal, Wells Fargo asserts that the bankruptcy court's legal interpretation was erroneous, and that the subordination agreement should have been analyzed under general principles of contract law. Because this is an issue of law, the Court reviews it *de novo.*

Both parties make numerous arguments as to whether subordination of a creditor's priority is properly considered under waiver principles. However, after considering the authority cited in the briefs, it is apparent

that neither party has identified any law on point. The parties are limited to relying upon isolated language from statutes and cases that is irrelevant to the determination at hand.[2]

■ Nonetheless, after carefully considering the circumstances of this case, the Court finds that the bankruptcy court was correct to apply waiver principles to Silva's subordination of his producer's lien. Silva's actions in signing the subordination agreement fit directly into the definition of waiver: the intentional or voluntary relinquishment of a known right. *Kay v. Kay*, 188 Cal. App.2d 214, 218, 10 Cal.Rptr. 196, 198 (1961). The right relinquished was Silva's first priority in the tomatoes he grew. This right was granted to him by the California State Legislature when it amended Cal.Food & Agr. Code § 55633 in 1979 to address the problem of agricultural growers who often faced financial ruin when processors to whom they had sold their crops defaulted on bank loans and entered bankruptcy.[3]

Wells Fargo's argument that Silva's subordination of his producer's lien was not a waiver because Silva did not unequivocally relinquish any rights is unpersuasive. Wells Fargo relies on language from California cases specifying that when a right is waived, it is gone forever. *See, e.g., Carmel Valley Fire Protection District v. State*, 190 Cal. App.3d 521, 534, 234 Cal.Rptr. 795, 802 (1987). According to Wells Fargo, Silva did not unequivocally relinquish any rights as a creditor by subordinating his producer's lien. Rather, his lienholder priority was merely "suppressed" until GVF's obligation to Wells Fargo was satisfied and after that it would simply "spring ... back into the vacated first position." However, this argument fails to acknowledge that Silva did give up a right forever by subordinating his producer's lien—the right to be the first creditor in line. Furthermore, as a practical matter, issues of creditor priority only become relevant when the debtor is insolvent. Therefore, in many cases, as here, subordination of a lien is functionally equivalent to a full release.

2. Wells Fargo claims that Cal.Civ.Code § 2934 and the case of *Collins v. Home Savings & Loan Assoc.*, 205 Cal.App.2d 86, 95, 22 Cal.Rptr. 817, 822 (1962), have recognized the distinction between subordination and waiver by using the conjunction "or" to separate the two concepts. *See* Cal.Civ.Code § 2934 ("any instrument by which any ... lien upon or interest in personal property ... is *subordinated or waived as to priority* may be recorded ...") (emphasis added); *Collins*, 205 Cal.App.2d at 95, 22 Cal.Rptr. at 822 ("different liens upon the same property have priority according to the time of their creation ...; a party, however, may agree to *waive or subordinate* the priority thus accomplished") (emphasis added).

This argument clearly lacks merit. As Silva points out, there are numerous California statutes that use multiple words having similar, if not virtually identical, meanings. *E.g.,* Cal.Food & Ag.Code § 55633 (certain liens have priority to all other "liens, claims or encumbrances"); Cal. Civ.Code § 3061.5(a) (referring to an owner who is a "grower or producer of crops.") Moreover, application of waiver principles to a subordination agreement does not require that the terms waiver and subordination be identical. Rather, it requires only that subordination of a lien be a type of waiver, just as a grower is a producer of crops and a lien is a type of encumbrance.

On the opposing side, Silva cites language in the case of *Middlebrook–Anderson Co. v. Southwest Savings & Loan Assn.*, 18 Cal.App.3d 1023,

1033, 96 Cal.Rptr. 338, 344 (1971) for the proposition that waiver analysis is applicable here. In *Middlebrook*, the court stated: "It is only as a result of the seller's waiver of his statutory right to a first lien that the lender achieves priority." *Id.*

However, the use of the word "waiver" in *Middlebrook* did not have any legal significance since it was not relevant to the court's decision in the case whether or not subordination agreements are properly subject to waiver analysis. As such, the isolated use of a particular word does not constitute a binding, or even persuasive, precedent. *See Ginns v. Savage*, 61 Cal.2d 520, 524 n. 2, 39 Cal.Rptr. 377, 379, 393 P.2d 689, 691 (1964) ("Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered.")

3. *See* Cal.Senate Comm. on Judiciary, Analysis of A.B. 774, 1979–80 Sess., at 1 (as amended Aug. 20, 1979) ("... Growers stand more or less defenseless when the processor pledges away the grower's pack, since the only thing of value *that they possess to insure getting paid is their* product. Lenders, on the other hand, can seek security interests in other assets held by the processor, i.e., real property, machinery and equipment, furniture and other fixtures. Should a processor default on a bank loan, the bank does not face financial ruin, as the grower might.")

In sum, the bankruptcy court's decision to apply waiver analysis to the subordination agreement was correct.

## II. *The Bankruptcy Court Incorrectly Applied California's Law of Waiver*

■ Having decided that the subordination agreement was properly subject to waiver analysis, the bankruptcy court went on to determine that Silva did not make a knowing and voluntary waiver of his producer's lien. Wells Fargo asserts that in doing so the bankruptcy court misapplied California waiver law.

■ Whether there has been waiver is a question of fact. *Howell v. Courtesy Chevrolet, Inc.,* 16 Cal.App.3d 391, 405, 94 Cal. Rptr. 33, 41 (1971). Waiver of a right conferred by law must be voluntary, knowing and done with adequate awareness of the relevant circumstances and likely consequences. *Bauman v. Islay Investments,* 30 Cal.App.3d 752, 758, 106 Cal.Rptr. 889, 893 (1973). A waiver is not effective unless the party executing it is fully informed of: (1) the existence of the right being waived; (2) the meaning of the waiver; (3) the effect of the waiver; and (4) a full understanding of the explanation of the waiver. *Id.; Hittle v. Santa Barbara County Employees,* 39 Cal.3d 374, 389, 216 Cal.Rptr. 733, 741, 703 P.2d 73 (1985). The burden is on the party claiming a waiver to prove it by clear and convincing evidence. *Harper v. Kaiser Cement Corp.,* 144 Cal.App.3d 616, 619, 192 Cal.Rptr. 720, 723 (1983). Doubtful cases will be decided against the existence of waiver, especially when the right alleged to be waived is one that is favored by law. *City of Ukiah v. Fones,* 64 Cal.2d 104, 107, 48 Cal.Rptr. 865, 867, 410 P.2d 369, 371 (1966).

Here, the bankruptcy court found that Silva's waiver was inadequate as a matter of law because the subordination agreement did not inform him of: (1) the magnitude of GVF's existing debt to Wells Fargo; and (2) the relation of this debt to GVF's existing assets. *GVF Cannery,* 188 B.R. at 665–66. The bankruptcy court determined that this information was necessary to satisfy the fourth element of the *Hittle* test by giving Silva a full understanding of the meaning of the waiver. *Id.* ("The GVF subordination agreement does not even state the magnitude of the existing debt owed to [Wells Fargo], let alone the debt's relationship to the value of the collateral, so that no one signing this document would be apprised by the document itself of what is being waived by the act of subordination: a priority position that matters not at all, or one of overwhelming importance, or something in between?")

Wells Fargo asserts that, for several reasons, the bankruptcy court's opinion imposes an onerous and impractical disclosure requirement on all lenders. First, in the context of complex loan agreements the amount of indebtedness can vary dramatically on a day-to-day basis. Requiring GVF to disclose the amount of debt owed to Wells Fargo in every subordination clause would be extremely burdensome, while conveying little useful information since the amount could change almost immediately.

Second, Wells Fargo argues that the bankruptcy court's decision demands not merely an explanation of the meaning of the waiver, but also a disclosure of the subjective wisdom of subordination in each individual case. According to Wells Fargo, by requiring GVF to inform Silva of the magnitude of debt owed to other creditors and the relation of this debt to GVF's assets, the bankruptcy court was in essence imposing some sort of fiduciary relationship on GVF to advise Silva as to whether subordination would be a savvy business decision.

The Court agrees with Wells Fargo. The bankruptcy court went too far in requiring GVF to provide financial and credit information to Silva before obtaining subordination of his producer's lien. What was required was merely that Silva be informed that: (1) he had a statutory first priority lien in his tomatoes; (2) by subordinating his producer's lien he was giving up his right to first priority; (3) this waiver would place him behind Wells Fargo as a creditor; and (4) if GVF went bankrupt and GVF's assets were not sufficient to cover its debts to Wells Fargo, Silva would not receive any further payment for his tomatoes.

Here, in a footnote to its opinion, the bankruptcy court did comment upon Silva's level of knowledge of the meaning and effect of the subordination agreement he signed.[4] However, the bankruptcy court's ultimate decision was premised on its finding that the subordination agreement was inadequate on its face as a matter of law. Therefore, the Court determines that the best course of action is to remand this case to the bankruptcy court to make additional factual findings regarding the effectiveness of Silva's waiver based on the four factors set out above.

## CONCLUSION

Based on the foregoing, the bankruptcy court's decision is AFFIRMED IN PART, REVERSED IN PART and REMANDED for further proceedings consistent with this Court's decision.

IT IS SO ORDERED.

## ORDER DENYING PETITION FOR REHEARING

Appellant Wells Fargo Bank, N.A. ("Wells Fargo") brought this appeal from the bankruptcy court's decision in an adversary proceeding initiated by Appellee Ed Silva. The adversary proceeding relates to the bankruptcy of GVF Cannery, Inc. ("GVF"). On September 11, 1996, this Court affirmed in part, reversed in part and remanded the case to the bankruptcy court. Now, Silva has filed a petition for rehearing, claiming that this Court failed to address one of his grounds for appeal: whether the subordination agreement that he signed could be rescinded based on GVF's fraud. For the following reasons, Silva's petition for rehearing is DENIED.

4. Footnote 8 of the bankruptcy court's opinion reads as follows:

In addition to being ignorant of the facts, it is apparent that Silva did not even know the meaning of the term "subordination" when he signed the April 1990 subordination agreement. His experience with Watsonville Canning left him with the impression that, regardless of the subordination agreement in that case, the collateral did in fact belong to him and that there was never any doubt about it. Even now, Silva does not appear to appreciate that, by subordinating his lien in the Watsonville Canning case, he exposed himself to the

## DISCUSSION

In its September 11, 1996 Order, the Court found that the subordination agreement signed by Silva was properly subject to waiver analysis, but determined that the bankruptcy court incorrectly applied California's law of waiver. Consequently, the Court remanded the case to the bankruptcy court to make further factual findings on the waiver issue. The Court did not address the bankruptcy court's additional determination that the subordination agreement was subject to rescission on the basis of fraud by GVF.[1]

After carefully considering the petition for rehearing, the Court finds that Silva is incorrect that it is necessary to analyze fraud as an independent ground for rescission of the subordination agreement. To the contrary, any alleged fraud used to obtain Silva's waiver of his producer's lien would impact upon the bankruptcy court's determination of whether the waiver was knowing and voluntary. After all, it is difficult to imagine a valid waiver that is obtained through the use of fraud.

Moreover, even if the fraud issue did warrant independent consideration, it is not sufficient to justify rescission of the subordination agreement under the circumstances here. This is the case because Wells Fargo, as a third-party beneficiary, relied on the subordination agreement to its detriment. 1 Witkin, *Sum. of Cal. Law, Contracts* § 671(c) (1987) (a change in position by a third-party beneficiary of a contract protects that beneficiary against rescission of the contract); *Angle v. U.S. Fidelity & Guaranty Co.*, 201 Cal.App.2d 758, 763, 20 Cal.Rptr. 391, 394 (1962) (same). Instead of rescission, parties

risk of losing rights in the collateral. His view seems to be that the effect of that subordination was to force him to hire an attorney and wait two years to recover the collateral, not that his producer's lien was jeopardized by the existence of the subordination agreement.

1. The bankruptcy court made findings that GVF knowingly concealed information about its financial condition from Silva with the intent to deceive him, and that Silva justifiably relied on GVF's representations. *In re GVF Cannery*, 188 B.R. 651, 667–68 (N.D.Cal.1995).

to the contract are limited to suing each other for damages.

Silva's reliance on the case of *Protective Equity Trust No. 83 Ltd. v. Bybee,* 2 Cal. App.4th 139, 2 Cal.Rptr.2d 864 (1991), to carve out an exception to the foregoing rule is misplaced. In *Bybee,* a seller agreed to sell real property to a buyer for $40,000 down and a purchase money trust deed of $170,000. The escrow instructions provided that the buyer would obtain a new construction loan of up to $95,000 and that the seller would subordinate the purchase money trust to this loan. The buyer subsequently obtained the loan and the seller signed a subordination agreement. However, the buyer did not use the loan for construction purposes and eventually defaulted on both the construction loan and the purchase money trust owed to the seller. The court held that the lender who gave the construction loan to the buyer could not enforce the subordination agreement because the lender could not assert greater rights than the buyer could himself. *Id.* at 151, 2 Cal.Rptr.2d at 870. The buyer was prevented from enforcing the subordination agreement because he did not comply with its terms by using the loan for construction purposes. *Id.*

*Bybee* is inapplicable here because the lender of the construction loan in that case was not even aware of the subordination agreement between the seller and buyer. *Id.* at 143, 2 Cal.Rptr.2d at 865. Therefore, the court in *Bybee* did not have the occasion to consider the issue before the Court in this case, since the lender, as a third party beneficiary, could not have relied upon an agreement which it did not even know existed.

### CONCLUSION

Based on the foregoing, Silva's petition for rehearing is DENIED. The case is REMANDED to the bankruptcy court for further proceedings consistent with this Court's September 11, 1996 Order.

IT IS SO ORDERED.