[Civ. No. 25106.   Second Dist., Div. Three.   Nov. 30, 1961.]

GWENDOLYN POLKINGHORN GENTLEMAN, Plaintiff and Appellant, v. NADELL AND COMPANY, Defendant and Respondent.

Wallace & Wallace and W. W. Wallace for Plaintiff and Appellant.

Klinger & Rubin, Tobias G. Klinger and Miles J. Rubin for Defendant and Respondent.

FORD, J.—The question presented on this appeal is whether the evidence was such that the trial court should have given judgment in favor of the plaintiff landlord against the defendant tenant for the loss sustained when the leased premises were damaged by a fire. The plaintiff alleged that the fire was caused by the presence on the premises of certain inflammable articles in violation of the terms of the lease. The trial court determined that none of the articles alleged to have been inflammable was a cause of the fire. Judgment was entered for the defendant.

The property involved was a one-story brick building on South Santa Fe Avenue in Los Angeles. It had a Summerbell arch-type roof. The lease was embodied in a printed form with typewritten insertions or additions. Portions thereof were as follows (italics being used herein to designate the typewritten parts):

"2. Said premises shall be used for the purpose of *Sale and warehouse of Paper Products and Unclaimed Freight* and for no other purpose whatever. There shall not be kept, used, stored or sold on said premises any inflammable or combustible substances. . . . Lessee agrees, without expense to lessor, to keep said premises in good order and repair, and in a clean and wholesome condition, and free and clean of all rubbish; . . . and further to pay for all damage occasioned lessor by any waste, misuse or neglect of said premises. . . . 19. *It is*

*understood between the parties hereto that in event the rate of fire insurance now in force shall be increased by virtue of the Lessee's occupancy, then the Lessee agrees to pay to the Owner any sum in excess of the amount she is now paying for fire insurance on the building. The said sum to be paid at the time that the Owner is billed for the same by her insurance company."*

The pertinent evidence will be stated. Seymour Nadelman, vice-president of the defendant corporation, was called as a witness by the plaintiff pursuant to the provisions of section 2055 of the Code of Civil Procedure. The fire was discovered early in the morning of November 29, 1956. Mr. Nadelman and his father closed the premises on the preceding evening. In doing so, Mr. Nadelman walked through the warehouse portion of the premises; he noticed no fire, and did not smell any smoke. He locked the rear door from the inside and left by the front door. There were large "no smoking" signs in the building. He did not know whether anyone had been smoking there; "people were running inside and outside all the time." Paper products in corrugated containers were on the premises; such products were paper cups, paper plates, rolls of paper, toilet paper, foil—"things of this nature." There were "a few hundred" cans of paint in the front or store part of the building, but none in the warehouse portion. In the warehouse was "an item called Sinox General," a weed killer, stored in 30-gallon drums which had been purchased as unclaimed freight from the Union Pacific Railroad; less than 10 drums were on hand. Cans of roof mastic in 5-gallon containers were in the warehouse. Also stored there were cans and drums of fluid lecithin, which were purchased as unclaimed freight; lecithin is a food product used by candy makers and confectioners. In addition, there were 60 or 70 cases of Reynolds charcoal starter in corrugated cartons; the product was in aluminum foil)

When called as a witness on behalf of the defendant, Mr. Nadelman testified that at the time of the fire no rags of any kind were stored in the warehouse area. He knew that there was no spillage or leakage of any liquid material because he would make an inspection of the warehouse as the back doors were being locked. There were no open cans there. As to his inspection the night before the fire, he testified: "I went to the back of the warehouse and locked the back doors and then walked down the center aisle to about the middle of the warehouse, passing each little aisle, cross aisle, turned off the

main switch, and then proceeded on forward to the front of the office.'' The turning off of the main switch ''cut off'' the electricity in the warehouse part of the premises. He did not know what caused the fire. The Reynolds charcoal starter had been purchased as unclaimed freight.

Calvin T. Owens, a general contractor and the brother of the plaintiff, testified on her behalf as to the condition of the premises after the fire as such condition was depicted in a number of colored photographic slides. While the witness pointed out certain 5-gallon cans, he was uncertain as to the nature of the contents of some of them. He testified that he ''broke open'' a can of paint ''toward the rear of the building.''

George Ayanian, an employee of the Fire Department of the City of Los Angeles, was called as a witness by the plaintiff. For the preceding eight years he had been assigned to the arson unit as an investigator. He investigated the fire. He arrived at 7 a. m. and was there while the fire was in progress. Approximately 15 companies responded to the alarm. His written report was received in evidence without objection.[1] On cross-examination, he testified in part as follows: ''I stated that miscellaneous articles in the warehouse were in a strewn about condition, probably due to the roof collapsing and hose streams being played, for one thing.'' He stated that he was not able to determine the cause of the fire. He further testified: ''I arrived at a conclusion. It was my conclusion that the fire was of accidental origin. As far as naming or pinpointing the cause, I was unable to do so. . . .'' With reference to a statement in his report ''that it was some activity on the employee's part, probably occurring during the unloading of the truck prior to the closing that caused this fire,'' Mr. Ayanian said in part: ''. . . when I stated employees, I am referring to the human element being active in the warehouse, and I believe that it was something possibly on their part that caused the fire. Once you eliminate the human element from

---

[1]In that report it was stated in part: ''The fire originated in the warehouse area and in approximately the center of this area. Storage in the area consisted of paper products such as cups, plates, napkins, rolls and several other miscellaneous articles. Point of origin was in these combustible items. The fire communicated from storage within the building and to the wood trusses and beams supporting the roof and to the roof itself. The fire destroyed almost the entire roof which covered the warehouse area. Fire also destroyed or damaged a major portion of the storage in the warehouse. . . . The destruction of the building and the contents of the warehouse area where the fire originated was so complete that we were unable to pinpoint the exact location of origin. . . .''

an area, then chances of a fire occurring are remote. There are one or two conditions: spontaneous ignition, or other specialized conditions where a fire could occur." When asked as to whether he saw evidence of spontaneous ignition, he testified: "Not as far as I carried out my investigation, no. Actually I don't feel it is possible I could eliminate all these items. I didn't spend that much time on the premises." As to his statement in his report that he believed the point of origin to have been in an area of the warehouse where there was a quantity of paper products, he said that his opinion was partially based on his observations on the premises and partially on the following: "The eyewitness who observed the fire prior to the arrival of the fire department, and after the fire department arrived, what was related to me by members of the fire department; what they observed, conditions that they found." In the area where the fire started there were miscellaneous items besides paper products, but the witness could not recall what they were. In his opinion, the fire was not of incendiary origin.

On redirect examination, the witness was asked: "And was there any intensity of this fire that you noticed, differing from other fires where only paper products were burning?" Mr. Ayanian replied: "I can't answer that question in that term. . . . This fire had already reached extensive proportions to be going through the roof, and it was a greater alarm fire at that time, and I can't determine whether it was paper products or anything else burning. The structure, itself, the wooden roof and the trusses and beams, which is [sic] of extensive thickness, were involved with fire, which in itself would give off a great amount of flame."

Carl A. Halter was called as an expert witness by the plaintiff. He was a former member of the Fire Department of the City of Los Angeles. He had been an investigator of fires since 1941. From 1941 to 1948 he was in charge of the arson squad. He was employed by the plaintiff to investigate the cause of the fire on the leased premises. His examination was made several days after the fire and before the debris was removed. He took materials from containers and tested them in the alley to see if they were "readily flammable." In response to an inquiry as to the materials tested which he found to be flammable, the witness stated: "There was a weed killer, there was some paint in cans, enamel and some lacquer, which was in the front end of the building; there was large cans of aluminum paint, which appeared to have a petroleum

thinner in it, and which was flammable; the weed killer itself was flammable; the material known as roof mastic was also flammable. The charcoal starter was also readily ignitable.'' He said that the paper products were combustible but not flammable. He saw ''tons'' of paper products which had not burned. There were aluminum paint cans which were open; other drums or cans had been damaged by the fire to such an extent that the contents had come out; there were cans which had ruptured; such cans contained flammable substances which the witness had described. As to the cause of the fire, Captain Halter said: ''My opinion is that the fire was either caused by careless smoking or by spontaneous ignition. . . . So it finally got to where I couldn't see but two possibilities for the fire. One was that it might have been started by some carelessness on the part of somebody in the plant smoking just before closing time, the evening before. This brought into play a problem of the time element involved, because if so, then the building had managed to hold this fire all night long. The other possibility, and it became a possibility largely because of . . . the various items stored in the building, that we might have had spontaneous ignition. I could not make a definite decision that it was spontaneous ignition, and yet that appeared to be the more probable cause, rather than careless smoking, and it just about had to be one or the other of them. There appeared to be no other cause for it.''

On cross-examination, Captain Halter said that in his tests in the alley he used ''a match as a source of ignition. . . .'' With respect to the charcoal starter, he opened up the package before igniting the enclosed material. The enamel and lacquer he tested were from the front of the building and not from the warehouse area; he could not identify anything in the debris as cans of lacquer or enamel. Captain Halter thought that a lighted match would give heat to the extent of a thousand degrees Fahrenheit, or more. He further testified: ''Combustible, actually is a term applied to any material which will burn like wood, paper or cloth. . . . Flammable is a term used to describe materials which are giving off vapors, which a flame will ignite. Normally a flammable material is classified in Class 1 and Class 2. Class 1 flammable liquid is something which would give off vapors at temperatures below 100 degrees Fahrenheit, and Class 2 flammables giving off vapors above 100 degrees Fahrenheit.'' He also stated: ''Actually a material has to heat spontaneously until it raises itself by this spontaneous heating to its ignition temperature and

then it ignites and burns. . . . There are certain materials of course, which we know from long usage do tend to heat spontaneously. Paint, for instance, with a base of linseed oil, particularly will if spilled on fibrous materials and then allowed to dry, will definitely heat spontaneously." He found no evidence of such spontaneous ignition in his inspection of the premises, but "such an item might be expected to have been burned up in the fire." He did not think the charcoal starter in the aluminum foil would spontaneously ignite at room temperature; the same was true as to the roof mastic in the containers, and as to the weed killer in the drums. He had no recollection of testing the lecithin, but it would not spontaneously ignite in the drums. He made no tests to determine if the weed killer and the roof mastic would spontaneously ignite outside their containers. The charcoal starter would not spontaneously ignite even outside the foil covering. Captain Halter could not "pinpoint" the exact spot in which the fire started; it "started somewhere near the center area of the warehouse section." He saw aluminum paint cans in the warehouse section but he did not recall the exact place; the cans of aluminum paint "appeared to have gone through the fire."

When asked on cross-examination whether he would agree that the cause of the fire was undetermined, Captain Halter testified: "That is quite correct. I could narrow it down to two possibilities. I did not make a definite decision as to what had caused it." He further testified as follows: "THE COURT: This would be your second alternative, that some produce [product] of some kind was spilled, allowed to dry at some past time? THE WITNESS: It might very well have been done that very evening. Actually, the terminology of the human element, something they did there just before quitting time, could cover the thing I had in mind." Whether any paint cans had been opened prior to the fire could not be determined by the examination of them.

▮ The appellant's position is that a violation of the terms of the lease occurred because inflammable substances were stored on the premises. Her cause of action was pleaded as being one in contract for damages because of such alleged breach. (*Cf. Morris* v. *Warner,* 207 Cal. 498, 504 [279 P. 152].) Assuming that there was such a violation, to warrant recovery it was necessary for the plaintiff to show a causal connection between the act or omission of which complaint was made and the loss sustained. (See *John Breuner Co.* v. *West-*

*ern Union Tel. Co.,* 108 Cal.App. 243, 255 [291 P. 445].) As succinctly stated in 32 American Jurisprudence, Landlord and Tenant, section 783: "If the lessee's use of the demised premises for the storage of articles therein, in violation of restrictions in the lease, or his act in the storing, upon premises leased for the storage of certain specified things, things of more dangerous and combustible nature, without authority from the lessor, is the proximate cause of destruction of the buildings by fire, he is liable to the lessor for the resulting damages."

While the burden of proof as to causation was on the plaintiff (see *Bartholomai* v. *Owl Drug Co.,* 42 Cal.App.2d 38, 42 [108 P.2d 36]; *Kennedy* v. *Minarets & Western Ry. Co.,* 90 Cal.App. 563, 576 [266 P. 353]), direct evidence as to the cause of the fire was not required. Such burden could have been met by evidence which was wholly circumstantial. Furthermore, it was not necessary to establish the cause with absolute certainty. (*New Zealand Ins. Co.* v. *Brown,* 110 Cal. App.2d 411, 413 [242 P.2d 674].)

In determining whether the plaintiff had met her burden, the trial court had to consider the testimony of Mr. Ayanian and that of Captain Halter together with that of Mr. Owens and Mr. Nadelman. The conclusion reached by Mr. Ayanian was that the fire was of accidental origin. He was unable to determine the cause. His belief was that the fire started in the area where there was a quantity of paper products. He found no evidence of spontaneous ignition. Captain Halter testified that he "could not make a definite decision that it was spontaneous ignition, and yet that appeared to be the more probable cause rather than careless smoking. . . ." When asked whether he agreed that the cause was undetermined, Captain Halter stated: "That is quite correct. *I could narrow it down to two possibilities.* I did not make a definite decision as to what had caused it."[2] (Emphasis added.)

---

[2] "An inference cannot be based on mere possibilities; it has been held that it must be based on probabilities. (32 C.J.S. 1132, 1133; *Gardner* v. *Seymour,* 27 Wn.2d 802 [180 P.2d 564, 569]; *Kentwood Lbr. Co.* v. *Illinois Cent. R. Co.,* 65 F.2d 663, 665.) This accords with the general principle, enunciated more than once by this court, that in civil cases the rule of decision is a rule of probability only. (*Spolter* v. *Four-Wheel Brake Serv. Co.,* 99 Cal.App.2d 690, 693 [222 P.2d 307]; *Wirz* v. *Wirz,* 96 Cal.App.2d 171, 175 [214 P.2d 839, 15 A.L.R.2d 1129].)" (*Sanders* v. *MacFarlane's Candies,* 119 Cal.App.2d 497, 500 [259 P.2d 1010]; see also *Brocato* v. *Standard Oil Co.,* 164 Cal.App.2d 749, 758 [331 P.2d 111]; *Robinson* v. *Board of Retirement,* 140 Cal.App.2d 115, 118 [294 P.2d 724].)

The trial judge was not required to accept the opinion of Captain Halter as the basis for a factual finding that the fire was caused by spontaneous ignition eventually resulting from the contact of inflammable liquid, which had leaked from its container, with some combustible material. Such opinion was to be weighed in the light of the other evidence. ██ ██ As said in *People* v. *Hecker,* 179 Cal.App.2d 823 [4 Cal.Rptr. 334], at page 827: "It is, of course, for the trier of fact to determine the weight to be given to the opinion of an expert witness [citation]; it is the exclusive judge of the effect and value of the evidence [citations] and the credibility of witnesses (Code Civ. Proc., § 1847), lay and expert [citations]; and it has the primary function of resolving factual conflicts." (See also *People* v. *Loop,* 127 Cal.App.2d 786, 800 [274 P.2d 885].) ██ The value of the opinion expressed was dependent on its factual basis (see *Owings* v. *Industrial Acc. Com.,* 31 Cal.2d 689, 692 [192 P.2d 1]) and the trial judge was free to reject it if it did not commend itself to his mind. (See *Petroleum Midway Co.* v. *Zahn,* 62 Cal.App.2d 645, 650 [145 P.2d 371].) While the trier of fact may not act arbitrarily in rejecting the testimony of a witness (*cf. Krause* v. *Apodaca,* 186 Cal.App.2d 413 [9 Cal.Rptr. 10]), in the present case it was reasonable for the trial judge to conclude that the basis for the expression of the opinion as to spontaneous ignition was too tenuous and that, accordingly, such opinion could not support a finding in favor of the plaintiff on the issue of causation.

██ The appellant argues that her case was aided by a doctrine akin to that of res ipsa loquitur. But such argument does not advance the appellant's position. It is clear that the trier of fact was free to draw the inference that the cause of the fire was undetermined. Under such circumstances, the doctrine of res ipsa loquitur would not have been applicable in a case based upon negligence. In *Brocato* v. *Standard Oil Co.,* 164 Cal.App.2d 749 [331 P.2d 111], at page 757, it is said: "The doctrine of res ipsa loquitur never has been regarded as a substitute for satisfactory proof of causation. As stated in 65 Corpus Juris Secundum 1010, section 220: '. . . there can be no foundation for the application of the doctrine where the physical act or thing which caused the injury is unknown or not disclosed or identified. Accordingly, it has been held that the doctrine is inapplicable where the injury might have been brought about by one of two or more causes, neither of which is included or excluded by any affirmative

evidence.' '' Dean Prosser states: ''On the other hand there are many accidents which, as a matter of common knowledge, occur frequently enough without anyone's fault.'' He then gives examples including ''a fire of unknown origin'' and says that such occurrences ''will not in themselves justify the conclusion that negligence is the most likely explanation; and to such events res ipsa loquitur does not apply.'' (Prosser on Torts (2d ed. 1955) § 42, p. 203; see also *The President Wilson*, 5 F. Supp. 684, 686; *McKinney Supply Co.* v. *Orovitz* (Fla.) 96 So.2d 209, 211; *Dodge* v. *McFall*, 242 Iowa 12 [45 N.W.2d 501, 502-503]; *Menth* v. *Breeze Corp., Inc.*, 4 N.J. 428 [73 A.2d 183, 186-187].) There is no sound basis for a contention that the fact of the storage of some inflammable materials and the fact of a subsequent fire were together sufficient, in and of themselves, to give rise to an inference as to causation in the nature of the inference which comes into being where the doctrine of res ipsa loquitur is applicable.

■ As stated in *Industrial Indem. Co.* v. *Golden State Co.*, 117 Cal.App.2d 519 [256 P.2d 677], at page 538: ''. . . it is settled law that if conflicting inferences may reasonably be drawn from the evidence, even if it is uncontradicted or all facts are admitted, which inference shall be drawn is a question for the trier of facts and its decision cannot be set aside by the appellate court.'' The trial court was clearly warranted in determining that the plaintiff had failed to sustain her burden of proof on the issue of causation. ■ While it is true that even if a substance improperly stored on leased premises is not itself the cause of a fire, liability may exist to the extent that such substance causes damage greater than would otherwise have occurred (see *Reid & Sibell, Inc.* v. *Gilmore & Edwards Co.*, 134 Cal.App.2d 60, 64-65 [285 P.2d 364]), in the case at bar the trial court was justified in reaching the conclusion that there was an insufficient basis in the evidence for a determination that there was such liability. This court cannot reweigh the evidence but can only determine whether or not there is substantial support in the evidence for the findings of the trial court. (See *Reid & Sibell, Inc.* v. *Gilmore & Edwards Co., supra,* 134 Cal.App.2d 60, 63.) With respect to the issues discussed in this paragraph, such support clearly appears.

In view of the conclusions heretofore expressed with respect to this appeal, it is not necessary to determine whether any provision of the lease had the effect, in any event, of relieving

the respondent of any liability for the fire. (*Cf. United States Fire Ins. Co.* v. *Phil-Mar Corp.*, 166 Ohio St. 85 [139 N.E.2d 330, 332-333].)

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.