[Civ. No. 11525.    Third Dist.    Apr. 5, 1968.]

CAPELL ASSOCIATES, INC., Plaintiff and Appellant, v. CENTRAL VALLEY SECURITY COMPANY, et al., Defendants and Respondents; SECURITY TITLE INSURANCE COMPANY, Defendant and Appellant.

774

Lally, Martin, Chidlaw & Viets, Lolly, Martin & Chidlaw and Thomas W. Martin for Plaintiff and Appellant.

McDonough, Holland, Schwartz, Allen & Wahrhaftig and Milton L. Schwartz for Defendant and Appellant.

Darrah & Darrah, Guard G. Darrah, Richard E. Saulque and William A. Sitton for Defendants and Respondents.

PIERCE, P. J.—Plaintiff Capell Associates, Inc. (Capell), an owner of land, sold part of it by contract of sale to S. J.

Torre for $221,400 with no down payment. Torre assigned the contract to Golf Club Estates, a corporation. The contract of sale contemplated a subdivision development with subordination of Capell's purchase money deed of trust to deeds of trust for "construction" loans. Defendant Security Title Insurance Company (Security) was the escrow holder. It was instructed by Capell regarding the provisions of the purchase money deed of trust it was to receive, with Capell as beneficiary, before Capell's deed was to be recorded. Particularly, it was instructed as to the provisions therein regarding subordination to construction loan deeds of trust. Security inadvertently prepared and, after execution, recorded a purchase money deed of trust violating those instructions. Golf Club Estates borrowed from Sacramento Savings and Loan Association (Savings and Loan). The construction loans were secured by deeds of trust. Homes and other improvements were built with part of the proceeds. The homes remained unsold. The purchase money promissory note became in default. The construction loans were also in default. Savings and Loan foreclosed and bought in the property at trustee's sales.

Capell filed two actions for declaratory relief and for money damages against all of the parties named above and a number of other defendants. The actions were consolidated for trial. Plaintiff obtained a judgment against Security for a sum which, with interest, exceeded $300,000. All other defendants were absolved.

A negligent breach of contract by Security as escrow holder in violating Capell's instructions is admitted. However, on Security's appeal we accept its contention that Capell suffered no compensatory loss caused by Security. We, therefore, reverse the trial court's judgment and direct that it award Capell nominal damages only.

Capell's appeal has not been supported by meaningful argument. Hence, this reviewing court cannot disturb the trial court's findings and judgment that defendants (other than Security) did not proximately cause Capell any damage.

## STATEMENT OF FACTS

The key to the solution of the problem of this case is primarily the contract of sale dated November 16, 1959, between Capell as seller and Torre as buyer. We summarize pertinent provisions of the agreement. The property agreed to be sold was 20 acres, and descriptions in the record show that

it adjoins Northridge Country Club in Sacramento County. As stated, the purchase price was $221,400. The entire purchase price was to be evidenced by a promissory note payable in two equal installments, one payable in 18 months, and the last on or before 3 years from the date of the note. The note was non-interest bearing except upon default. One David Rhame, a defendant, was to be a comaker of the note. The entire property was to be deeded and the note was to be secured by a purchase money deed of trust. The agreement recites that the 20 acres were being purchased "for the purpose of an individual dwelling subdivision to consist of eighty-two (82) residential lots. . . ." The deed of trust was to contain a provision that "after the new subdivision has been placed of record . . . the trustors, or their successors in interest, may from time to time, borrow from a . . . savings and loan association on the security of each of said lots severally in connection with a construction loan or loans obtained for the purpose of construction on each thereof street improvements and off-site subdivision improvements and a dwelling house with usual appurtenances, each such loan is to be evidenced by a promissory note in an amount not exceeding Fifteen Thousand ($15,000.00) Dollars, bearing interest at eight per cent (8%) per annum, and each of said loans is to be secured by a Deed of Trust on the lot on which the said improvement is to be constructed. Each and every one of the said Deeds of Trust, when duly recorded, shall constitute a lien and charge on the land respectively covered thereby, prior and superior to the lien and charge of the [purchase money] Deed of Trust . . . , which said latter Deed of Trust shall automatically become subordinate to the lien and charge of the said Deeds of Trust for construction loan purposes."

The paragraph following contained a provision for partial releases and reconveyances of lots for payments on account of the purchase price on the basis of the release of one lot for each $2,700 paid. Lots covered by construction loans were to be released first. Security was named as exclusive escrow agent of the parties. A subdivision map was to be filed on or before February 29, 1960. Assignment of the contract by the buyer was permitted (and contemplated at the outset).

On May 9, 1960, Capell's attorney sent to Security a copy of the agreement described, a duly executed grant deed to the property from Capell to Torre, a promissory note form, and a purchase money deed of trust form. The title company was

instructed to record the deed when it had for delivery an executed note and deed of trust corresponding to the forms enclosed. The deed of trust called for was substantially the same as that contemplated under the November 16, 1959 agreement. In referring to the construction loan deeds of trust to be accepted, and to which the purchase money deed of trust would be subordinated, the form recited: "[I]t being further understood that as to each of said notes given in connection with a construction loan obtained for the purpose of the above specified, *the full face amount thereof shall conclusively be deemed to have been used or applied to construction purposes.*" (Italics ours.)

On May 12, 1960, Torre and Rhame did send to Security: (1) a signed promissory note for $221,400 in favor of Capell, and (2) an executed deed of trust with Capell as beneficiary. The note conformed to the duplicate which Capell's attorney had furnished; the deed of trust (which, in fact, had been prepared by Security) did not. Its substantial difference was that it permitted automatic subordination of its lien to the subsequently recorded liens of *blanket* construction loan deeds of trust, whereas, as has been noted, the instructions called for a form of deed of trust permitting automatic subordination only to construction loan deeds of trust on *individual* lots. Nevertheless, on May 17, 1960, Security recorded the deed and immediately thereafter and on the same day recorded the executed deed of trust.[1]

In May Torre and Rhame conveyed the real property (theretofore granted by Capell) to Golf Club Estates, a corporation. The latter took subject to, and assumed, the $221,400 purchase money deed of trust. There was no consideration for the transfer which, as stated, had been contemplated by all parties at the outset.

On May 20, 1960, Savings and Loan loaned Golf Club

---

[1]Pertinent language in the recorded deed of trust provides: ". . . agrees that there may hereafter be placed and recorded on the within described property a Deed of Trust or Deeds of Trust to secure a loan or loans for the purpose of the construction of residences on any lot or lots in said subdivision. Provided that no default is of record under the terms of this note secured hereby and provided that no more than one (1) such deed of trust be recorded on each subdivided lot and further provided that such construction loans be made by a bona fide lender not to exceed in the principal the sum of $15,000.00, with interest not to be in excess of 8% per annum. Said construction loan deed of trust, or deeds of trust, when made shall automatically become and remain prior and superior to the lien of this deed of trust without any further agreement of the parties."

Estates $539,800, evidenced by two promissory notes for $269,600 and $270,200, secured by two deeds of trust covering 20 and 22 lots respectively of the subdivision. The notes bore interest at the rate of 8 percent per annum, interest commenced to accrue from the date of each note, May 20, 1960. During the period from said May 20, 1960, to February 1, 1961, monthly interest was payable. From March 1, 1961, through May 1, 1961, interest and minimal principal installments were to be paid. On May 20, 1961, the entire balance of each note matured.

The deeds of trust, of course, were "blanket" on 20 and 22 lots respectively. For internal control purposes, however, Savings and Loan denominated the $270,200 loan on its books as "Building and Loan Agreement No. 6031," and then broke this down to 22 subloans (carried as No. 6031-A through No. 6031-V), each such subloan representing funds allocated for construction on a single lot. The $269,600 loan, No. 6032, was similarly handled.

On November 25, 1960, a second lending transaction occurred. Savings and Loan loaned Golf Club Estates $133,300. But this time the procedure directed by Capell's instructions was adopted, i.e., 11 separate notes secured by 11 deeds of trust, each covering one lot, were taken.

On February 20, 1961, Capell, according to the record, discovered the incident of the "blanket" deeds of trust under the first loan transaction. There were negotiations. Savings and Loan agreed to cancel the two original deeds of trust and substitute forty-two therefor, each covering a single lot. It, of course, required that Capell subordinate the lien of its purchase money deed of trust to the substituted deeds of trust to be taken. Capell refused.

On March 2, 1961, there was a third construction loan transaction. Savings and Loan loaned $332,050 to Golf Club Estates. The amount was evidenced by 29 separate promissory notes, each on a single lot. (These lots, of course, had not been covered by previous deeds of trust. The same is true of the lots securing the November 25, 1960, transaction. Thus, Savings and Loan, after the March 2, 1961, transaction, had deeds of trust on all 82 lots within the subdivision.)

On March 1, 1961, the first group of construction loans became delinquent. Golf Club Estates had not made a single payment of either interest or principal on any of the loans. The loans would have become delinquent earlier but for the fact that Savings and Loan had applied some of the "loan

money'' called for under the several loans to satisfy overdue interest. The fact that Golf Club Estates had not made any payments must be attributed to the fact that not a single house built on the subdivision had been sold. This was true up to and through May 10, 1963, the date of the last of the trustee's sales to be described.

Commencing on June 6, 1961, Savings and Loan filed notices of default under all of its deeds of trust. Ultimately all of the 82 lots were sold at four trustee's sales. In the case of each of these sales, each lot was offered for sale and could be bid for and purchased separately. Capell did not appear at or bid for any of the lots at any of said sales. Savings and Loan bid at each sale an amount equal to the unpaid principal of the construction loan allocated to the particular lot offered plus costs.

The two consolidated actions, insofar as they sought relief against Security, are based upon the same act, the recordation by Security of the wrong deed of trust. Both prayed for $221,400 damages plus interest, $221,400 being the amount of Capell's unpaid purchase price. The theory of one cause of action was a tort liability for negligence, the other liability for breach of contract. The trial court found in favor of Capell on both theories and assessed damages in the full amount prayed for.

### The Question Is One of Causation

Security cannot, and does not, claim that it was not at fault in recording the wrong deed of trust. It does not question that if it is liable at all for compensatory damages suffered it is liable both under the theory of negligence and of breach of its contract as escrow holder. (*Amen* v. *Merced County Title Co.* (1962) 58 Cal.2d 528, 532 [25 Cal.Rptr. 65, 375 P.2d 33]; *Spaziani* v. *Millar* (1963) 215 Cal.App.2d 667, 682 [30 Cal. Rptr. 658].) It does not contend that *substantial* compliance by Security would bar recovery by Capell. It concedes that the substantial compliance rule related to the terms and conditions of an escrow does not apply in California. (*Love* v. *White* (1961) 56 Cal.2d 192, 194 [14 Cal.Rptr. 442, 363 P.2d 482].)

It contends correctly, however, and the brief of Capell concedes, that whether the action be in tort or contract compensatory damages cannot be recovered unless there is a causal connection between the act or omission complained of and the injury sustained. As applied to a case such as this, it is necessary for plaintiff to show by a preponderance of the evi-

dence that defendant's negligence contributed in some way to plaintiff's injury so that "but for" defendant's negligence the injury would not have been sustained. (*Gentleman* v. *Nadell & Co.* (1961) 197 Cal.App.2d 545, 551 [17 Cal.Rptr. 389], and see cases collected in 1 Witkin, Summary of Cal. Law (7th ed.) § 276, p. 305; 2 Witkin, Summary of Cal. Law (7th ed.) § 284, p. 1484; Rest.2d Torts, § 432, p. 430.) As the rule is stated by Witkin, in the work last cited, on page 1484: ". . . If the accident would have happened anyway, whether the defendant was negligent or not, then his negligence was not a cause in fact, and of course cannot be the legal or responsible cause. The 'but for' rule determines cause in fact."

The trial court found that Security's act was the proximate cause of Capell's loss of his property. Security argues that cannot be because if the authorized purchase money deed of trust had been recorded, the lender would merely have taken 42 promissory notes secured by 42 deeds of trust on separate lots, the same amount of money would have been loaned and borrowed, on the same terms, applied to the same purposes (all of which were authorized under Capell's instructions) and the same result—disastrous as it turned out to be—would have obtained.

We cannot negate that argument. Everything in the record to which our attention has been directed points to the fact that that is precisely what Savings and Loan would have done. Nothing in fact or reason indicates anything to the contrary. Savings and Loan treated the loans in every respect as though 42 separate deeds of trust had been taken instead of two. Each lot carried a separate subloan number; each subloan had its own loan-in-process account card; initial loan balances, subsequent accruals and disbursements were entered on the separate cards with net balances maintained individually; separate appraisals were made on each lot to determine loan amounts; separate physical inspections were accomplished as to each lot to determine what loan progress disbursements were proper; fees and charges were not arbitrarily prorated but were made on a lot-by-lot valuation basis. As stated, when the lots were sold they were offered for bid and sale separately.

We have stated above that in the agreement of November 16, 1959, between Capell and Torre, lies the key to Capell's loss. Analysis will demonstrate this. The agreement had been

preceded by negotiations. The parties had originally agreed to a purchase price of $180,400 ($2,200 per lot for 82 lots) of which $82,000 ($1,000 per lot) was to be a down payment and the balance ($98,400) was to be secured by the subordinated purchase money deed of trust. By the November 16, 1959, agreement the plan was changed. Capell instead of risking $98,400 decided to invest as "risk" capital the entire purchase price. The inducement was a prospective gain of $41,000. That was accomplished by increasing the purchase price from $180,400 to $221,400. The risks *expressly* assumed by subordination were these:

(1) Capell agreed to give priority to "construction" loans up to $1,230,000. ($15,000 per lot for 82 lots.) Note that the total principal of all construction loans *actually made* was less than that ($1,005,150).

(2) It waived all control over the ratio between houses completed and houses sold. It retained no right to stop or slow down construction if the houses did not sell. Indeed, we must conclude that Capell wanted construction to proceed as rapidly as possible. We assume this both from its waiver of control and from the fact that its "risk" investment bore no interest.

(3) It placed no conditions upon the terms of repayment of construction loans. Interest on each loan was to be at the rate of 8 percent per annum up to $15,000 per lot. Date of maturity was not controlled nor was there any condition against the "bookkeeping" application of loan "payments" to unpaid accrued interest; nor against the lending of additional sums secured by priority deeds of trust in the event of the delinquency of earlier loans. There was no provision contemplating "take out" loans.

(4) Capell exacted no obligation upon the buyer to put any of his own money into the enterprise after the subdivision map was filed.

(5) It furnished a loose definition of "construction." Loans were to be for dwelling houses and usual improvements, for streets and other off-site improvements, *but Capell also instructed Security that it was not to question expenditures. The purchase money deed of trust stated that the "full face amount" of each construction loan "shall conclusively be deemed to have been used for or applied to construction purposes."* (Italics ours.)

Capell states theoretical instances of the superiority of the

lien of *individual* deeds of trust (from the subordinating owner's standpoint) over the lien of *blanket* deeds of trust. No doubt they exist in cases where the subordinating owner has maintained controls to protect his equity. Capell argues that a tighter control over expenditures can be asserted. Here Capell had relinquished all control over expenditures. It argues that the blanket deeds of trust impaired the "release and reconveyance" clause (one lot covered by a construction loan deed of trust to be released *by the buyer* for each repayment of the construction loan with interest plus payment to Capell of $2,700). But no such payments by Golf Club Estates were ever made. Nor were they able to make them.

The controlling reason that no payments could be made was that no houses were sold. The cause of this, according to the record, was overbuilding in the area in 1960 plus an unexpected cutback in employment at Aerojet-General Corporation. During the period involved in this litigation there was never any market recovery. All houses *remained* unsold.

Both parties are critical of Savings and Loan's lending policies but are confronted with the following finding by the court: *"The purposes for which the loans by Sacramento Savings And Loan Association were made and the use made of the proceeds of such loans did not proximately cause plaintiff damage."* (Italics ours.) No showing has been made to us that substantial evidence does not support that finding. We are bound by it.

Since no other cause is suggested, a depressed market (with concomitant nonsale of houses) remains the sole proximate cause of Capell's loss. The construction loans coincided with, but were not a contributing cause of, the loss by Capell of its "equity" in the subdivision.

In *Karras* v. *Title Ins. & Guar. Co.* (1953) 118 Cal.App.2d 659 [258 P.2d 866] (hearing denied) the vendor's escrow instructions required a note from one Herndon. The escrow holder after accepting that note released it improperly, accepting in its stead a note executed by Ryan. In the trial court judgment was against the escrow holder. The court said (on p. 667): "As we have stated, the court erred in finding that defendant would not be liable for returning the Herndon note. However, a further question arises which was not determined below. Have the plaintiffs proved any damage? . . . There is no evidence in the case that the Herndon note was collectible. . . . Nor is there any evidence that the Ryan note given for it, is not collectible. . . . Obviously, . . . if the

Ryan note is collectible, plaintiffs have not been damaged by defendant's action." (See also *Southall* v. *Security Title Ins. & Guar. Co.* (1952) 112 Cal.App.2d 321, 323 [246 P.2d 74], hearing denied; *Security-First Nat. Bank* v. *Clark* (1935) 8 Cal.App.2d 709, 715 [48 P.2d 167], hearing denied.) In the last cited case the court said on page 715: ". . . If the San Diego bank had not deviated from the letter of instructions but had demanded a contractor's bond from Clark instead of the deed to the other property accepted as security, we are not satisfied from the record that the Los Angeles Bank would be in any better situation to protect itself than without the contractor's bond. No evidence of a substantial detriment or injury by noncompliance with the letter of instruction appears from the record."

*Collins* v. *Home Savings & Loan Assn.* (1962) 205 Cal.App. 2d 86 [22 Cal.Rptr. 817] (hearing denied) is Capell's anchor authority. That case has one similarity to this. There, as here, blanket construction loan deeds of trust were taken when deeds of trust on individual lots were intended. There the analogy ends. In *Collins* plaintiff did not sue the escrow holder. It was a battle drawn between the seller as plaintiff and the lender and purchasers as defendants. The facts were quite different from the facts here. The borrower made a down payment to the seller and represented that the balance of the purchase price, approximately $250,000, to be secured by a purchase money deed of trust, would be subordinated only to a $75,000 "partial construction" loan and other construction loans for house building purposes only. Total construction loans were not to exceed 80 percent of Veterans Administration fixed values and were to bear 7 percent interest. Actually the purchasers borrowed $2,134,860 under three blanket construction loans. The loans bore 6 percent interest PLUS 13½ percent as a lender's fee for making the loans (called "points"). The loans were expended partially for off-site developments—not contemplated by the sales agreement. (On the contrary purchasers had represented they already "had adequate financial resources for the construction of offsite improvements.") The $75,000 referred to above had not been a partial construction loan. It was paid by the lender to the borrowers and used by them as all or a part of the down payment to seller. The sum of $158,607.36 was also paid by the lender to the borrowers as a "contractor's fee" for "supervising" the construction work. When the escrow holder (not a party) had realized that

the escrow instructions called for construction loan deeds of trust on individual lots, it called for a new subordinating agreement and one was signed by plaintiff-seller.

The subdivision was a failure. There was a foreclosure. Houses had been sold to individuals. On page 93 of 205 Cal. App.2d, the court recites that the trial court had held : " ' [I]t is more equitable to grant a recovery to plaintiffs in damages for such amount [the purchase money balance], instead of setting aside the trust deed sales and involving the said lot purchasers.' "

The holding in the appellate court in *Collins* was that the second subordination agreement was ambiguous. Parol evidence established that the seller had only intended to subordinate to construction loans as indicated above. In affirming the trial court the Court of Appeal mentions the blanket deeds of trust. Their existence played no significant part in the holding.

The distinguishing differences between *Collins* and the case before us are obvious. This is not a controversy between lienholders over the priority of liens. Here the trial court expressly negated unauthorized application of construction loans as a cause of Capell's loss. In *Collins* the misapplication was not only unauthorized, it was fraudulent.

Capell argues, and Security concedes, that Capell had the right to condition the delivery of its deed upon any requirement that it deemed desirable ; that therefore the substitution of a provision in the purchase money deed of trust permitting blanket construction loan deeds of trust made recordation of Capell's deed improper and gave Capell a right of action. (See e.g., *Greenzweight* v. *Title Guar. & Trust Co.* (1934) 1 Cal.2d 577 [36 P.2d 186] ; *Promis* v. *Duke* (1929) 208 Cal. 420 [281 P. 613] ; *Los Angeles City High School Dist.* v. *Quinn* (1925) 195 Cal. 377, 383 [234 P. 313] ; *Todd* v. *Vestermark* (1956) 145 Cal.App.2d 374 [302 P.2d 347].) Capell undoubtedly had a right to sue either for a rescission or to quiet its title. This right could have been exercised as early as February 20, 1961. It elected, however, NoT to rescind the transaction, but on the contrary to affirm its contract of sale and to seek money damages against the escrow holder. In doing so it brought itself within the rule that it must prove damages proximately caused by the wrongful act. (*Karras* v. *Title Ins. & Guar. Co., supra,* 118 Cal.App.2d 569 ; *Security-First Nat. Bank* v. *Clark, supra,* 8 Cal.App.2d 709.) This it did not do. Its only loss was that flowing from its own improvidence—its

mistaken gamble on the success of a real estate subdivision venture—which events proved had been doomed to failure from the very inception of the transaction.

Capell has appealed from the judgment in favor of the defendants other than Security "to preserve its legal claim for damages against them" in the event of reversal of the judgment against Security. As stated above, the trial court found that Capell suffered no loss as the proximate result of any acts by said defendants. Capell's brief on its "contingent" appeal states: "Plaintiff concurs in and supports the trial court's judgment herein. The Court's findings against plaintiff and in favor of the defendants other than SECURITY are consistent with its finding in favor of plaintiff and against SECURITY as the proximate cause of its damage." Capell declares, however, in its brief that certain funds were diverted, or more accurately withheld, by Savings and Loan to satisfy unpaid interest and other sums were expended for "land draws, fees and expenses." We are given no transcript references or specific argument which could possibly justify this court in a holding that the trial court's findings and judgment in favor of the lender, borrower or other defendants were improper. Moreover, as we have noted above, the purchase money deed of trust form submitted by Capell expressly provided that, as regards the construction loans to which its lien was to be subordinated, the full face amount of each promissory note would *conclusively* be deemed to have been used as applied to construction purposes. Such a carte blanche instruction by Capell reasonably could lead to the conclusion that Capell wanted Savings and Loan to disburse the full amount of the authorized $1,230,000.

Capell is not entitled to compensatory damages. There was a breach of contract, therefore it is entitled to nominal damages. (Civ. Code, § 3360; *Sweet* v. *Johnson* (1959) 169 Cal.App.2d 630 [337 P.2d 499].) It might or might not have been entitled to recover costs in the trial court. (Code Civ. Proc., § 1032, subd. (d).) Costs, of course, were *actually* awarded under the judgment on the trial court's theory of compensatory damages. (Code Civ. Proc., § 1032, subd. (a).) Under the law only the trial court is given authority to make the determination as to the award of costs in the trial court under Code of Civil Procedure section 1032, subdivision (d). Capell is not entitled to costs on appeal.

Judgment in favor of Capell and against Security is

reversed with directions to the trial court to give judgment to plaintiff for nominal damages only plus (if the trial court in its discretion so decides) costs incurred by plaintiff in the trial court.

Judgment in favor of all other defendants and against Capell is affirmed.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied May 1, 1968, and the petition of the plaintiff and appellant for a hearing by the Supreme Court was denied May 29, 1968.