THOMAS A. FOLEY, Appellant, *v.*
LOUISE K. CARSON, Respondent.

No. 4230

March 10, 1960

349 P.2d 1056

(Petition for rehearing denied April 8, 1960.)

*Morse, Graves & Compton; Ham and Ham,* of Las Vegas, for Appellant.

*Jones, Wiener and Jones,* of Las Vegas, for Respondent.

## OPINION

By the Court, PIKE, J.:

Appeal from a judgment of the trial court. The trial court found that appellant, as an escrow holder of $12,000 of respondent's funds placed with him by her, had released such funds without first requiring compliance with certain conditions entitling him to do so. From this finding the court concluded that the respondent was entitled to recover the amount of such funds from appellant, and entered judgment accordingly.

Respondent's funds in the indicated amount had come into the possession of appellant as an escrow holder under the following conditions. One Louis Rubin was one of a group of persons interested in the planned opening and operation of a hotel and casino at Las Vegas, to be known as the Moulin Rouge. On March 23, 1955 Rubin wrote Mrs. Louise K. Carson, respondent herein, concerning procedures required to be followed by her to join Rubin and others as a partner in the contemplated hotel and casino operation. His letter informed her that certain partners in the enterprise then had applications pending for gaming licenses before the Nevada State Tax Commission. His letter went on to inform her that no sale to her of an interest in the partnership could be made until after such partners had been so licensed by the commission, but that after such licensing she should deposit her purchase money with the attorney for the Moulin Rouge operation, Thomas A. Foley of Las Vegas, Nevada, appellant herein. The letter then stated, "Said deposit shall remain in trust with the aforesaid attorney and shall not be utilized by Moulin Rouge until such time as you have received the approval of the Nevada State Tax Commission and the City of Las Vegas. Upon said approval, you will receive

evidence of ownership to the extent of ½ of 1%, and the sum of $12,000.00 shall be delivered to Moulin Rouge."

Rubin signed this letter as an individual, and on March 26, 1955 Mrs. Carson endorsed on the letter her acceptance and approval of its terms. Thereafter, on April 11, 1955 respondent wrote to appellant, enclosing her check of that date for $12,000 payable to Moulin Rouge, and inquired in what manner she would be notified when and where to appear in connection with her applications for gaming license.

By letter dated April 19, 1955 appellant acknowledged receipt of this letter and the check, stated that he would not present the check for cashing until the license was granted to Moulin Rouge and that, with respondent's permission, he would thereafter deposit her check for collection in his escrow account, ". . . and thereafter hold the same until such time as you, personally, are licensed by the Nevada Tax Commission."

Respondent and her husband went to the office of Don Ashworth, a Las Vegas accountant, on May 11, 1955 and there respondent executed the necessary papers relating to her applications for state and city gaming licenses.

On July 25, 1955 Foley received information by telephone from a state gaming control official that Mrs. Carson had been approved for a state gaming license, and on July 28, 1955 she was so licensed. After receiving the information that Mrs. Carson's application had been approved on July 25, 1955 appellant on that same date delivered the funds to Rubin.

The trial court found that appellant, as escrow holder, was required ". . . to retain said money until the Nevada Tax Commission and the City of Las Vegas had approved the application of plaintiff herein as a licensee for the gaming operation of said Moulin Rouge Hotel . . ." The trial court also found that appellant delivered the funds to the Moulin Rouge hotel on July 25, 1955 although respondent was not "approved" for a state gaming license until July 28, 1955 and was never approved for a city gaming license.

Additional findings of the trial court were that the funds were not delivered by the escrow holder to Rubin in accordance with the agreement (the letter of March 23, 1955) between respondent and Rubin, or in accordance with respondent's instructions to the escrow holder.

The trial court concluded as a matter of law that respondent was entitled to recover from the escrow holder the entire amount of the funds which she had deposited with him, and entered judgment accordingly, from which judgment this appeal has been taken.

Even though there may not have been a strict compliance by the escrow holder with the conditions and instructions under which he was authorized to deliver respondent's funds to Rubin, in order for liability to result there must be a causal relationship between such noncompliance and the loss of the funds. Sideris v. Northwest Bonded Escrows, Inc., 51 Wash.2d 851, 322 P.2d 349; Phoenix Title & Trust Co. v. Horwath et ux, 41 Ariz. 417, 19 P.2d 82, 87; Collier v. Smith, Mo.App., 308 S.W.2d 779, 784.

It is not claimed, nor is there any evidence to indicate there were any improper motives on the part of the escrow holder, and from the record it does not appear that appellant's deviation from a strict compliance with what may be viewed as his escrow instructions, was responsible for the loss of respondent's funds. True, appellant released the funds to Moulin Rouge on July 25, 1955, three days before respondent was licensed by the state in the gaming operation in which she sought to use her funds to purchase a partnership interest. In the absence of damage resulting therefrom, the breach of instructions was immaterial. Also, although the court found that respondent was never approved as a gaming licensee for the Moulin Rouge gaming operations by the city of Las Vegas authorities, the record does disclose circumstances of an implied approval.

In this regard the record shows that sometime between May 11, 1955, when Mrs. Carson applied for her city gaming license, and May 24, 1955, the opening date of

the Moulin Rouge hotel and casino, the board of city commissioners of Las Vegas had taken action with reference to a group of some 27 applicants, including respondent, for city gaming licenses in the Moulin Rouge operation. The commissioners, at a meeting held within the period indicated, approved eight of the applicants with reference to whom investigations had been completed, and undertook to make those so licensed responsible for the entire group of 27 applicants. This city board also authorized the use by Moulin Rouge of the funds of all applicants in the group. This action by the city authorities was taken more than two months prior to the time that the funds were delivered to Rubin, representing the Moulin Rouge operation. Here again there appears to have been a substantial compliance with the escrow instructions.

The record shows that the Moulin Rouge hotel and casino operation had become financially involved by August 1955, followed by bankruptcy proceedings. Respondent's funds, together with other funds which had been placed into the venture, were gone beyond hope of recoupment. The release of the funds to Rubin on July 25, under the particular circumstances referred to, had no relationship to respondent's loss. Respondent's loss was solely the result of her unfortunate investment.

Judgment reversed, with costs.

McNAMEE, C. J., and BADT, J., concur.