### In re MARKET SQUARE ASSOCIATES, LTD., Debtor.

### In re CHESTNUT GROVE ASSOCIATES, LTD., Debtor.

### MARKET SQUARE ASSOCIATES, LTD. and Chestnut Grove Associates, Ltd., Plaintiffs,

v.

### COMMONWEALTH LAND TITLE INSURANCE CO., Defendant.

Bankruptcy Nos. 80 B 11908 (PA), 80 B 11907 (PA).
Adv. No. 81-5225-A.

United States Bankruptcy Court, S.D. New York.

Jan. 8, 1986.

Whitman & Ransom, New York City, for debtors; Richard N. Tilton, of counsel.

Moses & Singer, New York City, for defendant; Jerome M. Lasky and David M. Satnick, of counsel.

PRUDENCE B. ABRAM, Bankruptcy Judge:

The debtors, Market Square Associates, Ltd. ("Market Square") and Chestnut Grove Associates, Ltd. ("Chestnut Grove") (Collectively the "Debtors"), both of which are Pennsylvania limited partnerships, each filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on November 12, 1980. Thereafter, and on May 4, 1981, the Debtors instituted this adversary proceeding against Commonwealth Land Title Insurance Co. ("Commonwealth").

The complaint has five claims for relief. Count 1 alleges that

"18. As a result of defendant's willful and intentional breach of its escrow agreement and the concomitant breach of its fiduciary obligations as escrowee, plaintiffs had no economic alternative other than to complete the settlement under the Market Square and Chestnut Grove Contracts of Sale, which settlement was finally consummated on February 8, 1980."

Count 2 alleges that Commonwealth knew or should have known that the Debtors would not have closed under the two contracts without first obtaining the release of the PNB second mortgage. The count alleges that the violation of the escrow agreement was done knowingly, willfully, intentionally, recklessly, negligently and with full recognition of the repercussions and damages to the Debtors. Compensatory damages of $5,000,000 are sought on the first count,[1] and punitive damages of $5,000,000 on the second count. As discussed below, this decision concerns the motion of Commonwealth for summary judgment dismissing Counts 1 and 2.

Count 3 sought damages for breach of the title policy issued by Commonwealth because of a lien for 1979 real estate taxes. Count 3 has previously been resolved.

1. The complaint does not articulate exactly what injuries are for which the $5,000,000 is intended as compensation. The court assumes that compensation is sought for damages incurred by purchasing the properties subject to the PNB Mortgage, or, possibly, for damages arising from the seller's failure to pay over monies to PNB.

Counts 4 and 5 seek damages for Commonwealth's alleged failure to record certain agreements prior to the recording of the assignment of a certain mortgage. These two counts are not involved in the motion for summary judgment and remain for disposition in the future. Commonwealth duly answered and discovery went forth in this and a related adversary proceeding.[2]

By motion filed September 23, 1983, Commonwealth sought summary judgment in its favor dismissing the first and second counts. The thrust of the motion is that, assuming the truth of the allegation that Commonwealth did in fact release certain closing documents out of escrow,

"The indisputable and uncontrovertible facts show that the noncompliance with the directions in the escrow agreement could not, in any meaningful respect, have caused plaintiffs to be compelled to consummate the transactions and that the loss claimed by plaintiffs cannot be attributed to said act of noncompliance." Affidavit of John M. Daly sworn to September 7, 1983 in Support of Motion for Summary Judgment (the "Daly Affidavit").

The Debtors have opposed the motion for summary judgment on the grounds that an issue of fact exists as to whether the Debtors were required to proceed with the "disastrous purchase of the properties as a result of Commonwealth's wrongful release." See affidavit of Marvin E. Greenfield sworn to October 19, 1983 in Opposition to The Motion for Summary Judgment (the "Greenfield Affidavit"). The initial statement pursuant to Local Rule 3(g) submitted by the Debtors of genuine issues of material fact stated in its entirety:

"Plaintiffs contend that genuine issues of material fact exist as to (1) whether the temporary restraining order provided an adequate and immediate legal remedy; (2) whether Commonwealth's release of the Escrow Documents in early January 1980 and its failure to inform plaintiffs of such release was a factual cause of

the economic duress experienced by the plaintiffs; (3) whether plaintiffs were aware that the sellers were fraudfeasors on December 20, 1979; and (4) whether plaintiffs have in any way ratified Commonwealth's breach."

Shortly thereafter a supplemental statement of material facts as to which the Debtors contended a genuine issue to be tried was submitted and consists of seven pages and contained fifteen numbered paragraphs.

Commonwealth submitted a fifteen-page statement under Local Rule 3(g) containing 43 numbered paragraphs as to which it contended there was no genuine issue to be tried. In its reply memorandum of law, Commonwealth stated that it was not submitting any affidavits in reply to the Debtors' opposing affidavits because the Debtors' recitation of the material facts comported in all material respects with that presented by Commonwealth in its moving papers except as to Commonwealth's alleged breach, which Commonwealth was conceding for the purpose of the summary judgment motion. Commonwealth's position remains that the Debtors would have had no greater rights or remedies had the documents remained in escrow and the sellers had no greater rights or options by reason of the release from escrow.

For the reasons which follow, the Court has concluded that Commonwealth's motion for summary judgment dismissing counts 1 and 2 of the complaint should be granted as the stipulated release from escrow was not the proximate cause of the Debtors' closing of the two contracts of sale. There is no issue of material fact to be tried because even assuming the facts most favorable to the Debtors they cannot prevail.

## THE FACTS

As the alleged escrow breach has been stipulated to by Commonwealth, no discussion of it is necessary. Recital of the bal-

---

**2.** No claim has been made by the Debtors that they have been unable to put forth facts essen-

tial to their opposition. See Fed.R.Civ.Proc. 56(f) and Bankruptcy Rule 7056.

ance of the facts is, of course, essential. In light of Commonwealth's concessions that it will take the facts as the Debtors have stated them, the following factual recital draws heavily on the papers of the Debtors. The court has not adopted the Debtors' statements wholesale only because a number of them are mixed statements of law and fact and this court is not bound to take the Debtor's legal conclusions.

Turning then to the facts, it appears that in August 1979, Market Square, through a nominee, entered into a contract to purchase a shopping center and post office located in Pennsylvania (the "Market Square Properties"), and Chestnut Grove, also through a nominee, entered into a contract to purchase a 64–unit townhouse complex, but not the underlying land located in Pennsylvania (the "Chestnut Grove Property"). The sellers of the two properties were corporations owned by Howard Garfinkle ("Garfinkle"), Cyrus West and Asher Fensterheim ("Fensterheim"). Fersterheim, a New York attorney, also acted as counsel for the sellers.

The Debtors had been set up by Marvin Greenfield ("Greenfield"), who intended to, and did syndicate the limited partnership interests in the Debtors. Greenfield is a real estate entrepreneur who had previously syndicated a number of other transactions. Greenfield and Garfinkle had known each other from three prior real estate transactions. Greenfield retained L. Michael Rudolph ("Rudolph"), an attorney whom Greenfield had retained on prior occasions, to represent the Debtors in making the purchases.

The agreed purchase price for the Market Square Properties was $3,050,000 of which $50,000 was paid upon the signing of the contract. The balance of the purchase price was to be paid by executing a purchase money wrap-around mortgage in favor of the sellers in the amount of $3,000,-000. The wrap-around mortgage was to include, or wrap around, two first mortgages held by institutional lenders, one in the amount of $1,608,000 and the other in the amount of $455,000 for an aggregate of $2,063,000. The agreed purchase price for the Chestnut Grove Property was $2,270,-000 of which $50,000 was paid upon the signing of the contract with the balance also to be payable at closing in the form of a purchase money wrap-around mortgage in the amount of $2,220,000 in favor of the sellers. The wrap-around mortgage was to wrap around a first mortgage in favor of an institutional lender in the approximate amount of $1,947,000.

Both contracts provided for a January 29, 1980 closing and provided that time was of the essence with respect to the closings. Both contracts contained the following clauses:

"19. If Purchaser shall default in the performance of any of the terms of this contract, this contract and the payment hereunder shall be retained by the Seller as liquidated damage, and neither party shall have any further rights against the other, and all claims between the respective parties herein shall cease.

\*     \*     \*     \*     \*     \*

"25. Purchaser will not record this contract or any memorandum hereof. If Purchaser shall violate the provisions of the preceding sentence, this agreement, at Seller's option, shall become null and void, and all of the rights of the Purchaser hereunder shall thereupon cease and terminate, and the Seller shall have the right to retain the contract deposit as and for liquidated damages for Purchaser's breach."

By a separate letter agreement executed at the same time as the two August 14, 1979 contracts of purchase, it was agreed that if the purchaser paid $300,000 on or before December 29, 1979, a deed would be executed and placed in escrow with a title insurance company. The escrow was to be released by payment of the balance of the money payable under the terms of the Contract of Sale on or before January 29, 1980, with all papers to be dated and bearing

interest from December 29, 1979. This side letter also provided that if the balance of the monies were paid on or before January 29, 1980, all income and expense for the property was to be for the account of the buyers as of December 29, 1979 and all apportionments made as of that same date.

Following the August 1979 execution of the contracts, Greenfield and Rudolph made numerous requests of the sellers for title reports, which reports were not forthcoming. In early December 1979, as the end of the year was rapidly approaching, the Debtors themselves applied for title reports and for title insurance from Commonwealth.

On December 19, 1979, an all-day pre-closing meeting was held at Fensterheim's office. Various closing details were discussed and resolved, and the escrow closing was scheduled for the following day. At this meeting, Garfinkle and Greenfield engaged in a transaction in which their designees exchanged checks for $307,000 for the purpose of capitalizing the two Debtor limited partnerships. The propriety of this exchange is irrelevant to the issues raised by the summary judgment motion.

Rudolph had received the title reports for the two properties on December 18. When he reviewed the title reports, Rudolph learned to his surprise that the two properties were encumbered by a blanket second lien in favor of PNB Mortgage Realty Investors ("PNB") in the amount of $3,525,-000. The PNB mortgage also encumbered certain other properties.

The PNB mortgage was a subject of discussion at the preclosing meeting, as its existence was previously unknown and contrary to representations in the Contracts of Sale. Garfinkle apologized for not revealing the PNB mortgage and stated that he had expected to have had the mortgage removed by the time of the escrow closing through closing the sale of an unrelated property and applying the proceeds to payment of the PNB mortgage. Garfinkle expressed confidence that the expected sale of the unrelated property would still go

through. Garfinkle offered additional collateral consisting of the following:

1. A mortgage in the fee of an adjoining piece of property, Chestnut Hill Village Apartments, purported to have a value of $1,200,000;

2. A mortgage in the fee of the Chestnut Grove Apartments;

3. An Indemnification Agreement providing that the sellers agreed to indemnify and hold the Debtors harmless in the event any payments became due on the PNB mortgage; and

4. An Offset Agreement which gave the Debtors the right to offset against the respective wrap-around mortgages any amount paid by the Debtors to the holders of the PNB mortgage.

The sellers' "equity" in the two wrap-around mortgages over the existing first liens was only about $1.3 million, an amount considerably less than the amount of the PNB lien, and therefore insufficient as "collateral" for the PNB mortgage. It was no doubt for this reason that Garfinkle offered the two additional pieces of property as collateral, in addition to the offset and indemnification agreements.

By letter dated December 19, written after the preclosing meeting, Rudolph advised Greenfield to reject title until the PNB mortgage was removed. Rudolph closed his letter stating:

"If the mortgages cannot be removed as required by our contract, then the deal should be terminated and the deposit returned. I know that seller has offered to post all kinds of security for the removal of the mortgages but if you decide to go ahead on that basis, your investors must be given a real, full and complete opportunity to rescind."

Greenfield determined, notwithstanding Rudolph's advice, to go forward with the escrow closing on December 20, 1979. Deeds to the two properties were executed in favor of the Debtors and the Debtors executed the purchase money wrap-around mortgages as part of the escrow closing. The deeds and the mortgages were delivered to Commonwealth to be held in escrow

to be released in accordance with the escrow agreement on the scheduled closing date of January 29, 1980. The escrow was initially due to expire on January 31, 1980, as Garfinkle had stated that the PNB mortgage would be removed by that date.

In light of subsequent events, it is well to consider the reason for the escrow with Commonwealth and the nature of the documents delivered to Commonwealth. The main, if not sole, function of such an escrow arrangement is to remove the necessity for future acts of the parties relative to execution of the documents escrowed. Once the documents are in escrow, the seller can be assured that the deed will be delivered only against receipt of the purchase money mortgage, and the buyer is assured that he will not have to commence suit to compel specific performance and the execution of a deed in his favor upon complying with the terms of the contract. In this case, the escrowed documents themselves had no intrinsic value. Each of the documents could have been readily replicated and reexecuted if lost, damaged or destroyed while in the escrow agent's hands. The documents lacked the intrinsic value of such instruments as bearer bonds or negotiable bills of lading.

Several days after the escrow closing and on December 24, 1979, the sellers' checks in the sum of $307,000 which had been given to the Debtors in the December 19 "paper transaction" were returned unpaid due to insufficient funds. The Debtors' checks, however, had cleared. Including this amount, the Debtors had paid outright to the sellers the sum of $1,307,000 by the end of 1979.

Sometime shortly after the escrow closing, Greenfield learned from an article in The New York Times that Garfinkle was a twice convicted felon, had been recently convicted of fraud and was awaiting incarceration. Greenfield thereafter became quite concerned about Garfinkle's intentions with respect to the removal of the PNB mortgage.

Garfinkle requested a delay of the scheduled January closing to February 8, 1980, and the escrow agreement was modified to reflect that date. On February 5, 1980 Garfinkle advised Greenfield that the PNB mortgage could not be removed. As removal of the PNB mortgage was not a condition precedent to the closing, the Debtors could not have refused to close for this reason. However, the Debtors wanted to delay the closing in an attempt to cause the PNB mortgage to be removed. The Debtors became concerned that they might be declared in default under the purchase contracts and lose the substantial monies already paid if they refused to close on the specified day. Rudolph advised Greenfield to retain a litigation attorney for the purpose of securing a temporary restraining order from a New York State court relative to the closing. Greenfield immediately retained Norman Grutman, Esq. ("Grutman"), a New York attorney. In addition, Greenfield retained a Pennsylvania attorney for the purpose of filing a *lis pendens* against the properties. The Debtors had not previously recorded their interests as contract vendees, although under the law of Pennsylvania, where the properties were situated, would have permitted such a recording.[3]

Grutman promptly prepared papers and commenced an action in a New York State court. The Debtors in their papers in this adversary proceeding refer to the State Court Action as one to enjoin the sellers from doing anything in violation of the Debtors' rights and enjoining Commonwealth from releasing the closing documents. The actual relief sought by the Debtors in the State Court Action was money damages, discharge of the PNB mortgage and specific performance of the two purchase contracts.

The Debtors obtained a temporary restraining order in the State Court Action on February 7, 1980 and a hearing on the application for a preliminary injunction was scheduled on February 11. The February 7 order provided, *inter alia:*

---

3. See 21 Pa.S. § 351.

"ORDERED, that pending a hearing of plaintiffs' instant application for a Preliminary Injunction, the defendant Commonwealth Land Title Insurance Co. be, and hereby is, enjoined and restrained from releasing any of the documents it holds in escrow pursuant to the escrow agreement and the [sellers], and their agents, employees, assigns, nominees or affiliates, or any other person acting on their behalf or subject to their control, be, and they hereby are, enjoined and restrained from in any way conveying, encumbering, pledging, alienating, or otherwise affecting the real property...."

Following the February 7 hearing, as the parties were leaving the judge's chambers, Fensterheim asked Greenfield to speak with Garfinkle on the telephone. Greenfield then spoke to Garfinkle on the telephone.[4] Garfinkle told Greenfield that he had made a grave mistake in obtaining a restraining order and Garfinkle then threatened that he was "going to beat [Greenfield] out of a million dollars." Greenfield agreed to go to Fensterheim's office to discuss the matter.

After Greenfield arrived at Fensterheim's office, Garfinkle stated to Greenfield that he, Garfinkle, was in possession of the closing documents which had been delivered to Commonwealth in escrow. Garfinkle threatened that if Greenfield did not close at once he would

"utilize the closing documents so that the restraining order would not be worth the paper it was written on and that [Greenfield] could chase him for the next ten years for the million dollars."

Garfinkle further threatened that he would predate the escrow documents prior to the issuance of the restraining order and negotiate the documents to another purchaser. Both Rudolph and Greenfield have stated that they believed that Garfinkle's posses-

sion of the escrow documents rendered the temporary restraining order of dubious worth.

Garfinkle's threat to take the escrow documents, backdate them and transfer the property to another was patently absurd. The two main escrow documents, the deed and the wrap-around mortgage, simply could not have been used to transfer the properties to a third party. The escrowed deed ran to the Debtors. Although the deed could have been altered to show a different grantee, it is unlikely that another grantee would have accepted such an altered deed. It would have been far simpler for Garfinkle to have obtained and used a blank deed form from any legal stationary store to convey the property to whom he wished. Until the recording of their status as contract vendees, the Debtors were at risk, escrow or no escrow, that Garfinkle would convey the property to a third party.

Indeed, the principal meaning the court takes from Garfinkle's threat is that he could "close" the transaction without the Debtors' consent simply by recording the deed and wrap-around mortgage. That would have stuck the Debtors with the properties subject to the PNB mortgage. If Garfinkle had done that, he could then have attempted to "negotiate" the wrap-around mortgage to a third party.

After listening to Garfinkle's threats, and having learned of his criminal record, Greenfield decided to close the contracts, believing that he was faced with the loss of the $1 million already paid, which loss would have ruined Greenfield and forced the partnerships into bankruptcy. The contracts closed as scheduled on February 8, 1980 and the Debtors discontinued the State Court Action and vacated the *lis pendens.*

Greenfields' problems with Garfinkle did not end with the closing.[5] Soon after the

---

**4.** Both the Debtors and Commonwealth are generally in agreement on the facts up until this point. Beginning at this point in time, Commonwealth, who was not privy to the conversations, takes a more wait and see attitude to-

wards the evidence that might be admissible at trial as Garfinkle is now deceased.

**5.** These subsequent events are set forth only briefly to complete the scenario prior to the Chapter 11 filings. In light of the court's hold-

closing the sellers as wrap-around mortgagees failed to make the payments due to the first mortgagees, even though the Debtors were making the payments due to the sellers under the wrap-around mortgage. The Debtors instituted an action against the sellers which was settled on July 12, 1980. The settlement agreement obligated the sellers to cure their defaults. When the defaults were not cured, a renewal of litigation occurred. The holder of the PNB mortgage[6] commenced foreclosure proceedings. To stave off the impending PNB foreclosure, the Debtors filed Chapter 11 petitions on November 12, 1980, which was less than a year after the December 1979 escrow closing.

## LEGAL DISCUSSION

In ruling on a motion for summary judgment, the court's task is to determine if there exist genuine issues of material fact, not to resolve factual issues. In the absence of such issues, the court is to order summary judgment if the movant is, as a matter of law, entitled to judgment. See, e.g., *Teitelbaum v. Equitable Handbag Co.* (In re Outlet Department Store, Inc.), 49 B.R. 536 (Bankr.S.D.N.Y.1985). In opposing a motion for summary judgment, a party must put forward its best case. Thus, this court must assume that the Debtors have put forward their best case. The court finds that none of the factual issues which may be in dispute are material.

The Debtors have sought recovery from Commonwealth under two theories, one based on contract and the other based on tort. This is permissible as the fact that an alleged breach of duty arose out of a contractual relationship does not mean that recovery cannot be had on a negligence cause of action. See *Rozner v. Resolute Paper Products Corps.*, 37 A.D.2d 396, 326 N.Y.S.2d 44 (3d Dept.1971), *aff'd* 31 N.Y.2d 934, 340 N.Y.S.2d 927, 293 N.E.2d 94 (Ct. App.1972). The contract theory is predicted on Commonwealth's alleged breach of the escrow agreement by the delivery of the escrowed documents to Garfinkle. For the purposes of the summary judgment motion, Commonwealth has conceded the wrongful release.[7] The Debtors' tort theory is based on the doctrine of business compulsion and alleges that Garfinkle was able to exert economic pressure on the Debtors as a result of Commonwealth's alleged breach of the escrow agreement. In an action to recover money paid under compulsion, the immediate necessity, or a reasonable belief in the immediate necessity, for making the payment to avoid consequences for which no other means of relief are available must be shown. See *Petcheff v. Christo Petcheff, S.A.*, 129 N.Y.S.2d 677, 689 (S.Ct. Kings County 1954). A payment made under duress is not void, but merely voidable and subject to ratification. See *Faske v. Gershman*, 30 Misc.2d 442, 215 N.Y.S.2d 144, 148 (Mun.Co.N.Y.C.1961). As a general rule, a threat not to perform an existing agreement cannot furnish the ground for a charge of duress so as to relieve the allegedly coerced party from the effect of concessions or payments made through such a coercion. One so coerced must resort to legal remedies. If the legal remedies available are inadequate in light of the probable consequences, the doctrine of business compulsion provides that the making of a contract may be under such circumstances of business necessity as will render the same involuntary and excuse the allegedly coerced party from its performance, especially where undue advan-

---

ing, it is unnecessary to go into the specifics in detail as the court need not reach Commonwealth's arguments addressed to these subsequent events.

6. It is the PNB Mortgage that ties these cases together like Siamese twins. As originally conceived, the two transactions would have simply been parallel deals with no economic intertwinings.

7. Under the terms of the Escrow Agreement, if the escrow terminated, the wrap-around mortgages were to be returned to the Debtors and the deed to the sellers. For the purposes of the motion, the court has been asked to assume that all documents were released to Garfinkle.

tage or a threat to do an unlawful injury is shown. See *Wou v. Galbreath-Ruffin Realty Co.*, 22 Misc.2d 463, 195 N.Y.S.2d 886 (S.Ct.N.Y.Co.1959).

Under either the contract or tort theory, the Debtors must show that the damages suffered were proximately caused by the breach of the contract or by the tort, a the case may be. For the reasons which follow, the court finds that Commonwealth's alleged breach of the escrow agreement, whether considered under the Debtors' contract theory or under their tort theory, was not the proximate cause of the Debtors' alleged injury: the purchase of the two properties subject to the PNB Mortgage.

Few concepts in the law have proved so elusive of definition or difficult of application as "proximate cause." *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). It is frequently stated that "[t]he proximate cause of an event is that which, in a natural sequence unbroken by any new cause, produces that event, and without which that event would not have occurred." 41 N.Y.Jur. *Negligence* § 30 at 44. The courts are in agreement that the determination of proximate cause must be made on a case by case basis. See *Pagan v. Goldberger*, 51 A.D.2d 508, 510, 382 N.Y.S.2d 549, 551 (2d Dept.1976); Prosser, *Law of Torts*, § 42 at 249 (4th ed. 1971). Causation, be it proximate or remote, is an event which results in the happening of another event. A determination of proximate cause must involve a deeper analysis than merely examining the subjective motives of the actors.

It is the Debtors' view that the wrongful release of the escrow documents produced the closings and that those closings would not have occurred without the release. The Debtors urge that once the documents were released Garfinkle could have done exactly as he threatened. The court does not take issue with the assertion that Garfinkle, twice-convicted of fraud and facing a jail term, would have in all likelihood attempted to make good on his threat in one fashion or another, although as stated above, the court finds the exact threats made to be without meaning.

What produced the closings was the fact that the Debtors had no legal means of compelling Garfinkle and the sellers to remove the PNB mortgage since removal of the PNB mortgage was not a condition precedent to closing. Simply put, the Debtors assumed the risk that Garfinkle would not or could not remove the PNB mortgage. In closing, the Debtors paid what they had agreed to and received what they had bargained for.

The asserted release of documents from escrow and the threats alleged to have been made by Garfinkle certainly make an interesting story. However, consideration of the problem of causation in this case is much enhanced if one hypothesizes the simplest scenario: the documents remain in escrow, as they should have, and Garfinkle does not remove the PNB mortgage by the agreed closing date because he does not choose to remove the PNB Mortgage or because he does not have the funds necessary to satisfy the PNB mortgage or cannot raise them. If that had happened, the outcome for the Debtors would still have been the same: they could not have refused to close because of the PNB mortgage without risking loss of the $1,307,000 already paid.

It thus becomes clear that the damages alleged by the Debtors would have been the same even in the absence of Commonwealth's breach. Thus, Commonwealth's breach could not have been the proximate cause of the Debtors' loss. The risk of loss created by not having the PNB mortgage removed prior to closing was assumed by the Debtors as of December 20, 1979, when Greenfield agreed to accept the additional security offered by Garfinkle. The Debtors' injury was assured by the payment to Garfinkle of in excess of $1.3 million outright. The third factor which combined to mandate that the Debtors' close even though the PNB Mortgage had not been removed was the Debtors own agreement in the original purchase contracts that they would not record their interests as contract

vendees. This court simply does not find it necessary to decline summary judgment in order to conduct factfinding on the question of the Debtors' motives for closing, including the basis for the belief of Debtors' counsel that the temporary restraining order was rendered ineffectual by the escrow release. These facts, to the extent in dispute, are not material ones. The central conclusion of the court that proximate cause is lacking would not be altered by these facts.

The Debtors' New York action, which significantly was brought by the Debtors before they learned of any alleged escrow breach, sought to compel Garfinkle to close, i.e., to perform the contracts. The Debtors were trying to prevent Garfinkle from declaring the contracts breached and keeping the $1,307,000 already paid. Perhaps the Debtors hoped that Garfinkle's criminal record would allow them to accomplish in the courts what the contracts would not permit the Debtors to insist on. Indeed the Debtors' game plan may have been to pressure Garfinkle economically into a settlement by obtaining a *Yellowstone* -type injunction, delaying the closing, thereby keeping the properties *in limbo*.[8]

The unauthorized release of the escrow, simply put, did not produce an event, the closings, without which the event would not have occurred.[9] See *Capell Associates, Inc. v. Central Valley Security Co.,* 260 Cal.App.2d 773, 67 Cal.Rptr. 463, 470 (Ct.App. 3d Dist.1968) (escrow holder not liable for breach of escrow agreement where evidence showed plaintiff's "loss was that flowing from its own improvidence—its mistaken gamble on the success of a real estate subdivision venture—which events proved had been doomed to failure from the very inception of the transaction."); *Foley v. Carson,* 76 Nev. 102, 349 P.2d 1056, 1058 ("the [unauthorized] release of the funds ... had no relationship to respondent's loss. Respondent's loss was solely the · result of her unfortunate investment.").

The court is not unmindful of the policy considerations involved. The law places a fiduciary duty on those who undertake the obligation of an escrow holder, 20 N.Y.Jur. *Escrow* § 6, and failure to act in accordance with such obligations will be carefully scrutinized by the court. This decision in no way condones the negligent or wrongful behavior of an escrow agent. However, escrow agents are not insurers, and no public policy is served by treating them as such.

Commonwealth's motion for summary judgment in its favor on Counts 1 and 2 will be granted.

Prevailing party to settle appropriate order.

---

**8.** See *First National Stores, Inc. v. Yellowstone Shopping Center,* 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (Ct.App.1968) *reversing,* 28 A.D.2d 873, 281 N.Y.S.2d 873 (App.Div.1967). A *Yellowstone* injunction extends the time to perform an act pending a determination of whether the act is required.

**9.** Because the court finds proximate cause lacking, the court finds it unnecessary to consider whether the Debtors' tort theory is sufficient as a matter of law. Commonwealth was not acting in concert with Garfinkle nor has it been shown to have had any knowledge of Garfinkle's threats. Likewise, the Debtors made no payments to Commonwealth under compulsion.