PETER W. CLEGG *vs.* GRAHAM & HARSIP, P.C.

No. 00-P-1468.

Middlesex. September 10, 2002. - November 27, 2002.

Present: LENK, KAPLAN, & MASON, JJ.

*Contract,* Performance and breach, Damages. *Proximate Cause.*

At the trial of an action for breach of an agreement in which the plaintiff would supply funds to the defendant escrow agent for a company's purchase of tires from a manufacturer in return for payment to the plaintiff of a prescribed "container fee" as a profit, the evidence did not demonstrate that the company's failure to forward an invoice to the defendant prior to the defendant's having wired the plaintiff's money to the company affected the transaction in any way [602-603], or that the defendant could have foreseen the plaintiff's loss of investment as the probable consequence of the defendant's nonreceipt of the invoice [603-604].

CIVIL ACTION commenced in the Concord Division of the District Court Department on July 7, 1997.

The case was heard by *Stephen S. Ostrach,* J.

*Alan Joel Finkel* for the plaintiff.

*Kathleen M. Colbert* for the defendant.

KAPLAN, J. Affirming the judgment of the Appellate Division, Northern District, and agreeing with its full opinion, we do but restate the case and grounds of decision in our own words.

Ecoterra Limited, a California corporation, called the "Company" in the relevant "Amended and Restated Escrow Agreement" of December 9, 1993 ("Agreement"), planned to purchase remolded tires from Retreads International Limited, an English corporation (called the "Manufacturer"), and to import and resell the tires to dealers here. In order to finance the plan, the Company invited individuals to become "Subscribers," that is, to supply funds for the Company's purchase of designated containers of the tires from the Manufacturer. Under the Agree-

ment entered into between the Company and the law firm Graham & Harsip, P.C. ("Escrow Agent"), and acknowledged and accepted by the Subscribers, the Subscribers would pay in their subscriptions direct to the Escrow Agent who, complying with the predicate terms of § 2(a) of the Agreement, would wire the necessary amounts to purchase container loads from the Manufacturer. The dealers would send their payments for the goods direct to the Escrow Agent. Upon receipt of the payment from a dealer for a container funded by a Subscriber, the Escrow Agent would pay the Subscriber therefrom, as a profit, a prescribed container fee, would replenish the Subscriber's account to the amount of his subscription, and would credit the Company with any balance.[1]

In the end, the entire plan failed because of inherent defects of quality in the container loads of tires which were not detected upon inspection and which rendered the tires, by and large, unsaleable.[2] The plaintiff lost the $18,575.34 of his initial subscription of $25,000 used, on behalf of the Company, to purchase one container load, which then remained unbought by any dealer. In this calamity the Company could perhaps have been held ultimately responsible to Clegg,[3] but the Company went bankrupt. Clegg turned to the Escrow Agent.

Clegg, plaintiff, sued to recover his loss from the Escrow Agent, defendant, for the defendant's alleged breach of § 2(a)(ii) of the Agreement dealing, as already indicated, with the conditions for the Escrow Agent's payment of the purchase price to the Manufacturer abroad (added was a claim for breach of fiduciary duty). The Appellate Division agreed with the District Court, where the action was tried nonjury, that the Escrow Agent had not complied with the contract provision, but held, reversing that court, that the breach was minor and not an

---

[1]The Escrow Agent would withdraw for itself a base fee of $200 per container transaction.

[2]There was witness testimony that the casings used by the Manufacturer in the remold process were of inferior quality; the products after buffing and addition of new rubber looked like new tires but were fundamentally flawed.

[3]On this point it may be suggestive that § 2(i) of the Agreement provided (omitting details) that in case of loss sustained by one Subscriber, the Escrow Agent could "accrue funds" otherwise belonging to the Company from sales to dealers of goods originally funded by other Subscribers.

effective cause of the loss. The judgment appealed from, now affirmed, allows the plaintiff only nominal damages of $1.00, see Restatement (Second) of Contracts § 346(2) (1981).

1. *Breach.* Section 2 of the Agreement was entitled "Distribution and Management of Escrowed Account" and section (a) thereunder read thus:

> "(a) *Manufacturer Invoices.* Upon receipt of (i) a written certificate from the designated company inspector signifying Company acceptance of a shipment of goods, (the 'Certificate of Acceptance,' attached hereto as Exhibit 'C') and (ii) a pro forma invoice from the Company, the Escrow Agent shall pay the amount of U.S. dollars in pounds sterling directed by the Company (the 'Interim Payment'), such payment not to exceed the amount of $20,000, payable to the Manufacturer by wire transfer."

The "Certificate of Acceptance" (Certificate) of December 17, 1993 (set out in the record), signed by a Company inspector, indicates that the Company issued on December 11 a purchase order number 05 for the container load associated with Clegg's subscription, against which the Manufacturer issued its corresponding "pro forma invoice number 2975" of December 17. The Certificate states that the tires comply with the purchase order (referring to quality standards) and are ready for shipment. Size and value of the shipment are noted. The Certificate in terms authorizes the Escrow Agent to wire £12,224.46 to the Manufacturer on behalf of the Company. (We add that Clegg — actually his wife — made a deposit of $25,000 to the escrow account by check of December 22, and the Escrow Agent wired the purchase price to the Manufacturer on December 31.)

The plaintiff Clegg agrees that the Escrow Agent received a proper Certificate of Acceptance, but he denies it received a "pro forma invoice from the Company,"[4] and so, he says, the Escrow Agent was not authorized to wire the money.

---

[4] The word "Company" appearing in the words just quoted in our text, seems wrong, a misnomer, for one expects the invoice to come from the Manufacturer as seller; so the title of § 2(a) indeed suggests. On the other hand, the Escrow Agent may have preferred to deal with the Company, which would receive the pro forma invoice 2975 and pass it to the Escrow Agent. The point is not material.

If there was a failure to comply with § 2(a)(ii), which the defendant Escrow Agent has chosen not to contest, the breach was merely formal, of minimal practical importance. The invoice would be the customary bill for payment, marking quantity and price, matters already covered in the Certificate; it would furnish no additional protection to buyer or seller.[5] The neglect in forwarding the invoice to the Escrow Agent could be remedied, as soon as discovered, by handing up a hard copy of invoice number 2975. There is no plausible claim that the failure to tender the paper to the Escrow Agent affected the transaction in any substantial way. So far as appears, the goods were paid for and shipped and made available to dealers who, unhappily, did not respond.

2. *Causation.* So also, common sense tells us the breach of § 2(a)(ii), such as it was, did not figure as the effective cause of the loss. This appears on the face of things because the same loss presumably would have occurred even if there had been no such breach. In *McCann* v. *Davis, Malm & D'Agostine*, 423 Mass. 558, 561 (1996), Justice Wilkins observes that a malpractice claim against the defendant lawyers did not lie where the plaintiff's loss would have happened even if the defendants "had been diligent in all respects." Again, applying to the facts the familiar "unforeseeability" limitation on the recovery of damages for breach of contract, we find it hard indeed to say the defendant should have envisaged the plaintiff's loss of investment as the probable consequence of the Escrow Agent's nonreceipt of an invoice. See Restatement (Second) of Contracts § 351(1), (2) (1981)[6]; 3 Farnsworth, Contracts § 12.14 (2d ed. 1998); *Foley* v. *Carson*, 76 Nev. 102, 105 (1960) ("it does not appear that appellant's deviation from a strict compliance with what may be viewed as his escrow

---

[5]At trial the defendant suggested that a two-page fax of December 23 from the Company to the defendant amounted to a notice to pay and could substitute for the invoice, but the point need not be pursued.

[6]"Unforeseeability and Related Limitations of Damages. (1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made. (2) Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know."

instructions, was responsible for the loss of respondent's funds").[7] Further, if it were plausible to think of the loss as due to multiple causes, then we would surely recognize the quality defects in the goods to be the "primary, real, main, chief" cause, *Krauss* v. *Greenbarg*, 137 F.2d 569, 572 (3d Cir.), cert. denied, 320 U.S. 815 (1943), hence the effective cause, for which the defendant as Escrow Agent would not be answerable. Compare Knowlton, J.'s, description of effective cause in *Lynn Gas & Elec. Co.* v. *Meriden Fire Ins. Co.*, 158 Mass. 570, 575 (1893).[8]

It is not remarkable that the escrow arrangement, while protective of a Subscriber to some extent, did not serve as his guaranty against a substantive breakdown of the planned transaction.

3. *Limiting provisions.* The Agreement at sundry places characterizes the Escrow Agent's position in the plan, defines its duties, and exempts it from liability for actions deemed unblameworthy ("any action taken by it in good faith and reasonably believed by it to be authorized or within the rights or powers conferred upon it by this Agreement"). In view of its decision rejecting the basic claims, the Appellate Division pretermitted interpretation of the Agreement's limiting provisions, which the District Court judge had held unavailing for the defendant. We follow the Appellate Division.[9]

*Order of Appellate Division affirmed.*

---

[7] If breach of fiduciary duty were viewed as a tort even though "the gist" of the claim was contractual, cf. *Houle* v. *Low*, 407 Mass. 810, 813 (1990); *Barber* v. *Fox*, 36 Mass. App. Ct. 525, 529 (1994), then the causation requirement in respect to the breach would be defined less strictly, see Restatement (Second) of Torts § 431 (1965), but we think effective cause could still not be found.

[8] The District Court judge wrote dismissively of the whole issue of effective cause: "The Escrow Agent's failure to see that those conditions were met created a foreseeable risk that subsequent events would lead to irreparable financial loss as has happened." This smacks of the fallacy post hoc ergo propter hoc.

[9] The District Court judge correctly entered a finding for the defendant on the counts of the complaint sounding in theories other than breach of contract and of fiduciary duty. The judge also disallowed the affirmative defense of the statute of limitations (conceived to be the tort statute, G. L. c. 260, § 2A) as applied to fiduciary duty; the Appellate Division did not reach the question as it held against the claim itself. The particular findings below need not detain us, as the facts are plain enough.